Grunbeck v. Dime Savings Bank          CV-93-356-B    03/24/94 P

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Robert and Jennifer Grunbeck

   v.                                          Civil No. 93-356-B

The Dime Savings Bank of New York, FSB

**O R D E R**

Robert and Jennifer Grunbeck seek declaratory and injunctive relief preventing Dime Savings Bank of New York, FSB ("Dime") from foreclosing on their home in Milford, New Hampshire.  The Grunbecks allege that Dime's security interest in their home is unenforceable because the promissory note it secures authorizes Dime to charge compound interest in violation of N.H. Rev. Stat. Ann. 397-A:14 (West 1992).  Dime presently moves to dismiss the Grunbecks' suit pursuant to Fed. R. Civ. P. 12(b)(6), arguing, inter alia, that § 501(a) of the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 U.S.C.A. § 1735f-7a(1) (West 1989) (the "Monetary Control Act") preempts application of the New Hampshire statute to the Grunbecks' loan.

## I.  **FACTS**

Dime is a federally-chartered savings bank based in

Uniondale, New York.  In 1987, it began offering first mortgage

loans in New Hampshire through Dime Real Estate Services of New Hampshire, Inc. ("Dime Real Estate"), a wholly owned subsidiary that was incorporated in New York but licensed as a first mortgage lender by the State of New Hampshire. Before going out of business in July 1989, Dime Real Estate originated approximately 1,500 adjustable rate, negative amortization mortgage loans ("negative amortization" loans) to New Hampshire homebuyers. Dime Real Estate routinely assigned its interest in these loans to Dime.

In January 1988, Dime Real Estate originated a $111,000 negative amortization loan to Thomas Richards and Timothy Ray to purchase a home in Milford, New Hampshire. As per routine, the promissory note and mortgage instrument were immediately assigned to Dime. In October 1990, the Grunbecks purchased the home from Richards and Ray and agreed to assume their liability for the loan.

The Grunbecks' negative amortization loan had an adjustable interest rate, adjustable monthly payment amounts, and the potential for negative amortization. The original loan agreement provided for the loan's interest rate to vary monthly at a margin of 3% above an indexed rate set by the Federal Home Loan Bank Board ("FHLLB"), and for the required monthly payment amounts to

3

be adjusted annually to account for any rate variations that occurred during the year. To prevent "payment shock," payment adjustments were capped at preset percentages. The agreement's negative amortization clause, however, provided that any shortfall between the required payment and the total interest due in a given month was to be "deferred" and capitalized. The adjusted principal amount then became the amount against which interest was assessed for the subsequent payment period.

In 1993, the Grunbecks stopped making their required monthly payments and Dime instituted foreclosure proceedings. The Grunbecks responded by filing an ex parte petition in Hillsborough County Superior Court seeking to enjoin the forced sale of their home. The Grunbecks alleged that Dime's security interest was illegal and void ab initio because the loan's negative amortization provisions violated N.H. Rev. Stat. Ann. 397-A:14(I) (the "simple interest" law), which states that "[a]ny first mortgage home loan . . . shall provide for the computation of interest on a simple interest basis."[1]  The court denied ex

---

[1]The Grunbecks also claim that, by charging compound interest on first mortgage loans, Dime engaged in an unfair and deceptive practice in violation of N.H. Rev. Stat. Ann. 358-A, New Hampshire's consumer protection statute. They contend that the practice is "unfair" because it did not comply with the simple interest law, and that because Dime's failed to inform its

4

<u>parte</u> relief and scheduled a hearing.  Before the hearing took place, however, Dime removed the case pursuant to 28 U.S.C. § 1441(a).

Dime's motion to dismiss alleges that § 501(a)(1) of the Monetary Control Act preempts application of the simple interest statute to the Grunbeck's loan.[2]  In addition to briefing and oral argument by the parties, the Department of Justice of the State of New Hampshire (the "State") has submitted an amicus brief addressing the issues raised by Dime's motion to dismiss.

## II.  <u>DISCUSSION</u>

Section 501(a)(1) states, in pertinent part

---

borrowers or the New Hampshire Banking Commission of this fact, its loans had a deceptive patina of legality.

[2]Dime also argues that (1) the simple interest law is preempted by § 803(c) of the Alternative Mortgage Transaction Parity Act of 1982, 12 U.S.C.A. § 3803(c) (1989); (2) the Grunbeck loan's negative amortization provisions do not compound interest and so do not violate the simple interest law; (3) for various reasons, the loan does not violate the New Hampshire consumer protection statute; (4) for various reasons, the Grunbecks lack standing to bring their claims; and that (5) enjoining the foreclosure sale is not an appropriate form of relief because the Grunbecks have an adequate remedy at law and have not done equity themselves because they have failed to make all principal payments due and owing.  I do not address these arguments because I conclude that, as applied to the Grunbecks' loan, the simple interest statute is preempted by § 501(a)(1).

5

(1) The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is --

    (A) secured by a first lien on residential real property . . .;

    (B) made after March 31, 1980; and

    (C) described in section 527(b) of the National Housing Act . . . .

12 U.S.C. § 1735f.7a(1); see also 12 C.F.R. § 590.3(a) (1993)[3] (substantially reproducing same). Dime alleges that the simple interest statute is a law "limiting the rate or amount of interest" that a lender may charge, and that its application to the Grunbecks' loan is therefore preempted by § 501(a)(1). The Grunbecks respond by (1) denying that the simple interest statute is a law "limiting the rate or amount of interest,"[4] and (2)

_____

[3]As the relevant portions of the regulations have remained the same throughout the period at issue in this case, I cite the 1993 version for convenience.

[4]The Grunbecks do not dispute that their mortgage loan satisfies the qualifications set out in § 501(a)(1)(A)-(C). First, the loan is a first mortgage loan secured by the Grunbecks' home. Second, it was originated in 1988. Third, the loan is a "federally related mortgage loan" as defined in § 527(b) of the National Housing Act (12 U.S.C.A. § 1735f-5(b)). It is secured by a single family dwelling and it is eligible for purchase by the Federal National Mortgage Loan Association and/or the Federal Home Loan Mortgage Corporation. § 1735-5(b)(1) and

6

arguing alternatively that the statute is exempted from preemption because it is a "provision[] designed to protect borrowers." See 12 C.F.R. § 590.3(c). I conclude that the simple interest statute's application is preempted as a matter of law, and accordingly reject the Grunbecks' contentions.[5] See Adkins v. General Motors Corp., 946 F.2d 1201, 1207-08 (6th Cir. 1991), cert. denied, 112 S. Ct. 1936 (1992).

## A. Section 501(a)(1) -- The Express Preemption Clause

Before addressing the merits of the parties' arguments, I briefly set out the legal principles governing my analysis.

### 1. Preemption Doctrine

The bedrock assumption underlying the various preemption doctrines is that "the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress. . . ." Cipollone v. Liggett Group, Inc., 112 S. Ct. 2608, 2617 (1992) (quoting Rice

_____

(2)(C).

[5]In ruling on Dime's motion to dismiss, I review the allegations of the complaint in the light most favorable to the Grunbecks, accept all material allegations as true, and dismiss their claims only if no set of facts entitles them to relief. See, e.g., Berniger v. Meadow Green-Wildcat Corp., 945 F.2d 4, 6 (1st Cir. 1991); Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir. 1989).

v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947) (brackets in original)). As a result, preemption analysis essentially requires a determination of congressional purpose. Id. Absent explicitly preemptive language, such a purpose to preempt may be inferred where Congress has completely displaced state regulation in a specific area, or where the state law conflicts with federal law or frustrates its purposes and objectives. Id.; Federal Sav. & Loan Ass'n v. De La Cuesta, 458 U.S. 141, 153 (1982).

Here, my task is to construe § 501(a)(1), the Monetary Control Act's express preemption clause. Given that there is therefore "no need to infer congressional intent to pre-empt state laws from the substantive provisions'" of the Act, id. at 2618 (quoting California Federal Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 282 (1987)), my inquiry is limited to 'identify[ing] the domain expressly preempted' by the terms of the preemption clause. Id.; Greenwood Trust v. Massachusetts, 971 F.2d 818, 823 (1st Cir. 1992), cert. denied, 113 S. Ct. 974 (1993). Because this inquiry thus is necessarily an exercise in statutory construction, I begin my analysis with the text of § 501(a)(1) and assume that its ordinary meaning accurately expresses Congress' purpose. Morales v. Trans World Airlines, 112 S. Ct. 2031, 2036 (1992) (quoting FMC Corp. v. Holliday, 489

8

S. Ct. 52, 57 (1990)).

2.  <u>Statutory Analysis</u>

**a)  The Text**

As evidenced by the parties' differing positions, the phrase "limiting the rate or amount of interest" has two plausible meanings.  Dime argues that a law prohibiting the charging of interest on interest is a law "limiting the rate or amount of interest" because it reduces the number of permissible methods by which New Hampshire lenders can calculate the interest they charge.  In other words, Dime essentially construes "limiting" as an adjective meaning "serving to restrict or restrain." <u>Random House Dictionary of the English Language</u> 1115 (2d ed. 1987) (unabridged) (defining "limiting").  The Grunbecks and the State interpret the statute more narrowly, arguing that a law "limiting the rate or amount of interest" is a law imposing an absolute, numerical cap on the interest that a lender may charge.  They thus essentially construe "limiting" as a verb meaning to impose a "final, utmost or furthest boundary" on permissible interest rates or amounts.  <u>Id.</u> (defining "limit").  Given that the text of § 501(a)(1) does not compel either reading of the term, I must look beyond the text to determine the scope of Congress' intent. <u>See</u> <u>United States v. O'Neil</u>, 11 F.3d 292, 295 (1st Cir. 1993).  I

9

turn first to relevant administrative interpretations of § 501(a)(1).

   **b)     Administrative Interpretations**

   Deference to reasonable regulatory interpretations is "singularly appropriate" when the statutory ambiguity lies in an area "intricately related to the agency's area of special expertise." Bank of New York v. Hoyt, 617 F. Supp. 1304, 1313 (D.R.I. 1985) (Selya, J.)(quoting Citizen Savings Bank v. Ball, 605 F. Supp. 1033, 1042 (D.R.I. 1985)). See also Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). The deference due, however, depends upon "the persuasive force of the interpretation, given the totality of the attendant circumstances." Hoyt, 617 F. Supp. at 1314.

   Here, the regulatory bodies charged with implementing the Monetary Control Act have implicitly adopted the term's broad reading, by twice construing the phrase "limiting the rate or amount of interest" to include state laws prohibiting the charging of interest on interest. In 1984, the FHLBB issued an opinion letter announcing its view that § 501(a)(1) and 12 C.F.R. § 590.3(a) (which essentially reproduces § 501(a)(1)) preempted state laws prohibiting the charging of interest on deferred or compounded interest. The letter stated that

10

[a]lthough [§ 501(a)(1) and 12 C.F.R. § 590.3(a)] do[] not specifically address the issue of the charging of interest on deferred interest or the compounding of interest on any loan secured by a first lien on residential real property . . . state laws which would prohibit the charging of such interest would constitute provisions 'limiting the rate or amount of interest . . . which may be charged . . . .'

Op. Off. Gen. Counsel. 1097 (Nov. 15, 1984). The Office of Thrift Supervision ("OTS"), which assumed the FHLBB's responsibilities after it was abolished,[6] also endorsed this view in responding to a similar query in 1991. See Op. Off. Chief Counsel 91/CC-37 (Aug. 16, 1991).

Although these two opinions unequivocally support Dime's reading of § 501(a)(1), the regulators have failed to provide any analytical support for the conclusory passage quoted above. In this circumstance, absolute deference would be nothing more than blind allegiance. Thus, while the FHLBB and OTS' interpretations are entitled to some weight, they are not dispositive. I accordingly proceed to the next logical step in my analysis -- determining which definition of "limiting" best effectuates Congress' purpose in enacting § 501(a)(1).

_____

[6]See Financial Institutions Reform, Recovery, and Enforcement Act of 1989, § 401(h), Pub. L. No. 101-73, 103 Stat. 183, 357; 54 Fed. Reg. 34637 (1989); Smith v. Fidelity Consumer Discount Co., 898 F.2d 907, 913 n.5 (3d Cir. 1989).

11

### c) Congress' Purpose in Enacting § 501(a)(1)

The title of § 501(a)(1) -- "Mortgage Usury Laws" --
attests to the overriding concern motivating the section's
passage. As expressed in the Senate Report accompanying the Act:

> The Committee finds that where state usury laws require
> mortgage rates below market levels of interest,
> mortgage funds in those states will not be readily
> available and those funds will flow to other states
> where market yields are available. This artificial
> disruption of funds availability not only is harmful to
> potential homebuyers in states with such usury laws, it
> also frustrates national housing policies and programs.

S. Rep. No. 368, 96 Cong., 2d Sess. 18, 19, reprinted in, 1980
U.S.C.C.A.N. 236, 254. More specifically, Congress pointed to
two concerns prompting § 501(a)(1)'s enactment --

> [1] [T]he adverse effects of usury ceilings on credit
> availability, and [2] mortgage rate ceilings must be
> removed if savings and loan institutions, as directed
> by other provisions of [the Act], are to begin to pay
> market rates of interest on savings deposits. Without
> enhancing the ability of institutions to achieve market
> rates on both sides of their balance sheets, the
> stability and continued viability of our nation's
> financial system would not be assured.

Id. at 255. In short, Congress passed § 501(a)(1) to (1) promote
the "stability and viability" of financial institutions by
allowing them to charge realistic borrowing rates and (2) to
promote national housing policy, the national secondary mortgage
market and home ownership by freeing the flow of credit from

12

state-imposed restraints.  <u>Hoyt</u>, 617 F. Supp. at 1310-11; <u>Shelton v. Mutual Sav. & Loan Assn</u>, 738 F. Supp. 1050, 1057 (E.D. Mich. 1990).  The magnitude and scope of this purpose requires that § 501(a)(1) be interpreted broadly.  <u>Shelton</u>, 738 F. Supp. at 1057.

Moreover, concluding otherwise would potentially subvert Congress' intent that § 501(a)(1) remove state limitations restricting the availability of first mortgage funds.  Consider the simple interest statute's potential effect on adjustable rate lending during periods of high interest rates:  without being able to charge interest on interest, many lenders would not allow potential borrowers to defer accrued interest; without being able to defer accrued interest, these borrowers would lose the ability to reduce their monthly payment amounts; without lowered monthly payments, these borrowers would become less able to afford mortgage loans; and without financially-able borrowers, lenders would have to either resign themselves to a reduced return on the loans they issue or invest their first mortgage funds elsewhere. In practice, the statute thus would limit the availability of mortgage funds in a way comparable to a numerical cap on interest rates.

13

The Grunbecks' more restrictive interpretation of § 501(a)(1) would allow such de facto limitations to escape preemption. They contend that Congress's concerns were prompted by a very specific problem -- state-imposed caps on interest rates and amounts -- and that its response should be construed as going no further than necessary to remedy this problem. The Grunbecks and the State thus do not deny Congress' dual purpose in enacting § 501(a)(1); they simply place a gloss on its breadth.

This position finds some support in the legislative history and relevant regulations. The section of Senate Report 368 twice-quoted above is entitled "Mortgage Ceilings," and its text is laced with references to state-imposed "ceilings" on interest rates. Moreover, the FHLBB's statement of purpose in implementing § 501(a)(1) reads

> Purpose and scope. The purpose of this permanent preemption of state interest-rate ceilings applicable to Federally-related residential mortgage loans is to ensure that the availability of such loans is not impeded in states having restrictive interest limitations.

12 C.F.R. § 590.1(b) (emphasis added).

This evidence undoubtedly indicates that the abolition of state-imposed interest rate ceilings was of primary concern to

14

Congress when it enacted § 501(a)(1). The Grunbecks, however, have failed to identify any evidence affirmatively indicating that Congress was concerned only with interest rate ceilings. In fact, the legislative history indicates exactly the opposite. The relevant section of Senate Report 368 states that "[i]n exempting mortgage loans from state usury limitations, the Committee intends to exempt only those limitations that are included in the annual percentage rate." 1980 U.S.C.C.A.N. at 255 (emphasis added). If Congress had been concerned solely with limitations on the numerical rate itself, it presumably would not be concerned with other kinds of limitations, such as interest on interest prohibitions, that are "included" in the interest rate. Moreover, given that the FHLBB and OTS have determined that 12 C.F.R. § 590.3(a)(1) preempts state simple interest laws, see supra Section II.B.1., the Grunbecks' restrictive reading of § 590.1(b) contradicts the implicit interpretation given this regulation by the agencies who promulgated and apply it.

In sum, consistency with the scope and importance of Congress' purpose requires that § 501(a)(1)'s preemption of state usury laws be interpreted broadly. See Shelton, 738 F. Supp. at 1057. While the Grunbecks point to evidence indicating that Congress was primarily concerned with eliminating restrictive

15

interest rate ceilings, this evidence does not establish that Congress intended to so limit the application of § 501(a)(1). On balance, I therefore conclude that Congress's purpose in enacting § 501(a)(1) is best served by adopting the broad reading of the term "limiting." Given the closeness of the case, however, I go on to consider two other extrinsic considerations relied on by the parties.

### d) Interpretations of Similar Language In National Bank Act

Previous interpretations of similar language in similar legislation are useful interpretive aids, both as persuasive precedent and as indicators of Congress' understanding of the contested phraseology at the time the legislation was enacted. See, e.g., Greenwood Trust, 971 F.2d at 827 (interpreting terms in § 521 of Monetary Control Act in light of previous interpretations of similar language contained in National Bank Act); Fourchon, Inc. v. Louisiana Nat. Leasing Corp., 723 F.2d 376, 381-83 (5th Cir. 1984) (construing phrase "rate of interest" in Preferred Ship Mortgage Act in accordance with previous construction of similar phrase in National Bank Act to preempt state law prohibiting charging of interest on interest). Here, Dime argues that construing the phrase "laws limiting the rate or

16

amount of interest" to include state prohibitions on charging

compound interest derives strong support from the Supreme Court's

previous interpretation of similar language in the National Bank

Act of 1864, Ch. 106, 13 Stat. 99 (codified, as amended, in

scattered sections of 12 U.S.C.) (the "Bank Act").  I agree.

Section 85 of the Bank Act, provides that national banks

> may take, receive, reserve, and charge on any loan or
> discount made, or upon any notes, bills of exchange, or
> other evidence of debt, interest at the rate allowed by
> the laws of the State, Territory, or District where the
> bank is located, or at a rate of 1 per centum in excess
> of the discount rate on ninety-day commercial paper in
> effect at the Federal reserve bank in the Federal
> reserve district where the bank is located, whichever
> may be the greater, and no more, except that where by
> the laws of any State a different rate is limited for
> banks organized under state laws, the rate so limited
> shall be allowed for associations organized or existing
> in any such state under this chapter.

12 U.S.C. § 85.  Section 85 thus essentially provides that

national banks may charge the interest rates allowed by the laws

of the state in which they are located, and "no more".  To

establish these limits, § 85 subsumes state laws limiting the

rate of interest that a lender may charge.  Section 86 then

provides for the  imposition of civil penalties for intentionally

"usurious" transactions -- those transactions involving the

"taking, receiving, reserving or charging a rate of interest

greater than is allowed by section 85 . . . ."   12 U.S.C. § 86.

17

In Citizens' Nat. Bank v. Donnell, 195 U.S. 369 (1904), the Supreme Court considered whether a state prohibition on charging compound interest was a law limiting the rate of interest that national banks in that state could charge pursuant to a predecessor to § 85.[7]  195 U.S. at 373-74.  The facts of the case were simple:  the state law at issue provided that "interest shall not be compounded oftener than once in a year," and the defendant bank had charged plaintiff interest on interest several times in one year.  Id. at 373.  Attempting to escape § 86's civil penalties, the bank essentially argued that the state law was not a law limiting the rate of interest that could be charged under § 85 was because it merely limited the mode by which interest was calculated, not the rate or amount assessed.  Id. The Supreme Court summarily rejected this argument, stating that the law limited interest rates because "[t]he rate of interest which a man receives is greater when he is allowed to compound than when he is not ...."  Id. at 374.  The Court then concluded that, by charging interest in excess of these state-imposed limitations, the bank had committed usury and was liable to the

---

[7]At the time of the Supreme Court's decision, §§ 85 and 86 were codified at U.S. Rev. Stat. §§ 5197 and 5198.  Despite subsequent amendments, the relevant language of §§ 5197 and 5198 remains the same.

18

plaintiff under § 86.  Id.; see also Acker v. Provident National Bank, 512 F.2d 729, 732-33 (3d Cir. 1975); Partain v. First National Bank, 467 F.2d 167, 173-75 (5th Cir. 1972).

The Supreme Court's holding in Donnell bolsters Dime's reading of § 501(a)(1) in two respects.  First, it offers persuasive support for construing "laws limiting the rate or amount of interest" to include laws prohibiting compound interest.  See Fourchon, 723 F.2d at 381-83 (relying on Donnell to hold that phrase "rate of interest" in Preferred Ship Mortgage Act preempted state law prohibiting charging of interest on interest).  Second, it indicates that such laws also qualify as state "usury laws" which the title to § 501(a)(1) indicates Congress intended to preempt.  See also Partain, 467 F.2d at 173-75; Acker, 512 F.2d at 732-33.  Accordingly, Congress' use of the phrase "limiting the rate and amount of interest" in § 501(a)(1), as well as its use of the term "usury laws" in the Senate Report and in section headings in the Monetary Control Act, make it unlikely that Congress intended state interest on interest prohibitions to escape preemption by § 501(a)(1).

### e)  Harmony with the Parity Act

The State invokes the Alternative Mortgage Transaction Parity Act of 1982 (the "Parity Act"), 12 U.S.C. § 3801 et seq.,

19

in a final creative effort to avoid preemption under the Monetary Control Act.[8]  Before the Parity Act was passed, federal regulations authorized only federally-chartered depository institutions to engage in alternatives to fixed-rate, fixed-term mortgage transactions.  The Parity Act ended this preferential treatment by authorizing any lender who qualifies as a "housing creditor" under the Act to "make, purchase, and enforce alternative mortgage transactions"[9] so long as the lender complies with certain OTS regulations  imposing detailed disclosure requirements and other conditions.  See 12 U.S.C. § 3803(a); 12 C.F.R. §§ 545.33 and 563.99(3).  If a lender complies with these regulations, it may engage in alternative

_____

[8]Although I do not agree with all of the arguments contained in the State's brief, it was clear and informative.  Moreover, it raised several important points that the parties in this case failed to bring to my attention.  Accordingly, I commend the State for the quality of its advocacy.

[9]Negative amortization loans such as the Grunbecks' potentially qualify as alternative mortgage loans under the Parity Act because: (1) the Act's definition of "alternative mortgage transaction" includes "a loan or credit sale secured by an interest in residential property . . . involving . . . variations [on interest rates] not common to traditional fixed-rate, fixed-term transactions . . .", 12 U.S.C. § 3802(1); and (2) the implementing OTS regulations specifically authorize transactions that contemplate "the deferral and capitalization of interest" on first mortgage loans.  12 C.F.R. § 545.33(a).

20

mortgage transactions "notwithstanding any state constitution, law or regulation." 12 U.S.C. § 3803(c).[10]

The State's Parity Act argument has three steps. First, the State concedes that the Parity Act will preempt New Hampshire's simple interest statute when a qualifying lender issues a negative amortization loan that complies with the Act's disclosure requirements. Second, it contends that the incentive to comply with these disclosure requirements -- preemption -- would be meaningless if lenders could claim preemption for the same transactions under another statute without making the required disclosures. Finally, it concludes that construing the Monetary Control Act to preempt the simple interest statute would therefore be "illogical and contrary to public policy" because doing so would leave lenders with no incentive to comply with the Parity Act. See American Tobacco Co. v. Patterson, 456 U.S. 63,

---

[10]Dime contends that the Parity Act's preemption clause provides an alternative basis for dismissal. The Grunbecks respond that the Parity Act is inapplicable because Dime is not a "housing creditor." The State concedes that the simple interest statute may not be enforced to prevent lenders who comply with the Parity Act from engaging in alternative mortgage transactions but argues that Dime cannot invoke the Parity Act's preemption clause because it has not established that it complied with the Act's disclosure requirements. I do not reach the Parity Act preemption issue because I hold that the simple interest statute is preempted by the Monetary Control Act.

21

71 (1982) (statutes "should be interpreted to avoid untenable distinctions and unreasonable results whenever possible"); United States v. Burns, n. 93-1251, 1994 WESTLAW 26989, *3 (1st Cir., Feb. 8, 1994) (slip op.).

The fatal flaw in the State's argument is that it construes both the nature of the transactions covered by the Parity Act and the scope of the Act's preemption clause too narrowly.  First, negative amortization provisions are not the only characteristics that qualify a loan as an alternative mortgage transaction. Thus, the Act's preemption clause would still provide an important incentive for lenders to engage in other types of alternative mortgage transactions even if simple interest statutes are preempted by the Monetary Control Act.  Second, unlike the Monetary Control Act, which preempts only laws "limiting the rate and amount of interest" or similar charges, the Parity Act preempts any state laws that are inconsistent with a qualifying lender's right to issue alternative mortgage loans. Simple interest laws are merely one of several categories of such inconsistent state laws.  These two factors indicate that the Parity Act and the Monetary Control Act serve related but distinctly different functions.  Construing the Monetary Control Act to preempt simple interest laws thus does not eliminate the

22

incentive for lenders to comply with the Parity Act's disclosure requirements. As a result, it deprives neither Act of meaning to recognize that their preemption provisions may overlap.

**B.   The Saving Clause -- 12 C.F.R. § 590.3(c)**

As a fall-back position, the Grunbecks and the State argue that, even if the simple interest statute is a law "limiting the rate or amount of interest," it is exempted from preemption by a regulation attempting to shield "state laws on prepayment charges, attorneys' fees, late charges or <u>other provisions designed to protect borrowers</u>" from preemption under § 501(a)(1). 12 C.F.R. § 590.3(c) (emphasis added). The Grunbecks and the State primarily contend that the simple interest statue is a borrower protection provision because it represents New Hampshire's determination that compound interest provisions are "not as clear and straightforward an accrual formula as a simple interest calculation," and thus they pose a danger to borrowers. I agree that compound interest loans pose serious risks for unsophisticated or unwary borrowers. Nevertheless, this protective <u>purpose</u>, however worthy, does not qualify the simple interest statute for exemption from § 501(a)(1).[11]

_____

[11]This case presents a situation in which both the Monetary Control Act and the simple interest statute serve important but

23

Two factors compel this conclusion.  First, logic dictates that restrictive state laws otherwise subject to preemption under § 501(a)(1) cannot escape the statute's reach merely because they can be justified in terms of their intended beneficial effects on the state's citizenry.  If this were the case, the saving regulation would swallow the statutory preemption clause, rendering illusory its stabilizing effect on financial institutions and its liberating effect on the flow of credit in the residential mortgage market.  Second, and more importantly, established principles of statutory interpretation dictate that, to the extent that 12 C.F.R. § 590.3(c) is interpreted to exempt state laws "limiting the rate or amount of interest" from preemption under § 501(a)(1), the regulation conflicts with the statute's express language and is therefore void.  See Shelton, 738 F. Supp. at 1057 (citing Board of Governors v. Dimension Financial Corp., 474 U.S. 361 (1986)).

Not surprisingly, given these two factors, the FHLBB and OTS have opined that state laws prohibiting the charging of interest

---

competing public policy concerns.  Given the scope and breadth of the Monetary Control Act's preemption provision, I can only conclude that Congress determined that the policies underlying the Monetary Control Act override the consumer protection purpose served by the simple interest statute.

24

on deferred interest or the compounding of interest "are not consumer protection provisions of the type contemplated by [12 C.F.R. § 590.2(c)]."  Op. Off. Gen. Counsel 1097 (Nov. 15, 1984); Op. Off. Chief Counsel, 91/CC-37 (Aug. 16, 1991).  I agree.


### III.  CONCLUSION

To summarize, this is a close case.  As used in § 501(a)(1), the phrase "laws limiting the amount and rate of interest" is susceptible to two plausible interpretations.  The broad interpretation includes any laws that serve to restrain or restrict the rate or amount of interest that a lender may charge, and the narrow interpretation excludes all but those laws imposing ceilings or caps on interest rates and amounts. Undoubtedly, preemption clauses should be construed "cautiously and with due regard for state sovereignty," especially in such areas of historical state power as banking and consumer protection.  Greenwood Trust, 971 F.2d at 828.  However, where "Congress has acted within its authority and its intent to displace state law is clear," concerns about state sovereignty do not override this intent.  Id.; see also Mendes v. Medtronic, Inc., No. 93-1911, at 7, 1994 U.S. App. LEXIS 4153 *8 (March 7, 1994) (slip op.).  Given that the relevant regulatory bodies have

adopted the broad definition of § 501(a)(1), that this definition best serves Congress' purpose, and that it is strongly supported by Supreme Court precedent construing similar terms in a similar Act, I conclude that the broad meaning of the phrase best mirrors Congress' intent.  I therefore hold that, because N.H. Rev. Stat. Ann. 397-A:14(I) restricts the method by which lenders may calculate interest charges and thereby potentially limits their return on their investment, it is a "law[] limiting the rate or amount of interest" that a lender may charge and is consequently preempted by § 501(a)(1) of the Monetary Control Act.[12]  Dime's Motion to Dismiss with Prejudice (document no. 5) is granted.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

March    , 1994
cc:  Walter Maroney
     Douglas Verge
     Jewel Kline
     George Dickson

_____

[12]I also dismiss the Grunbecks' Consumer Protection Act claim because it is dependent upon Dime's alleged violation of the simple interest statute.

26

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

Robert and Jennifer Grunbeck

    v.                                 Civil No. 93-356-B

The Dime Savings Bank of New York, FSB

**O R D E R**

    In light of my Order of March    , 1994, the Grunbecks' Motion for Leave to Amend (document no. 10) is moot.

    SO ORDERED.

                                               _____
                                               Paul Barbadoro
                                               United States District Judge

March 24, 1994

cc:  Walter Maroney
     Douglas Verge
     Jewel Kline
     George Dickson