Acquiles Leonidas CABRAL, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 93–1514.

United States Court of Appeals,
First Circuit.

Heard Nov. 4, 1993.

Decided Jan. 31, 1994.

Randy Olen, Johnston, RI, for petitioner.

William C. Lengacher, Attorney, Office of Immigration Litigation, with whom Frank W. Hunger, Assistant Attorney General, and Richard M. Evans, Assistant Director, Washington, DC, were on brief for respondent.

Before SELYA, CYR and STAHL, Circuit Judges.

CYR, Circuit Judge.

After Acquiles Leonidas Cabral was convicted by the Commonwealth of Massachusetts as an accessory to murder, he was ordered deported for committing a "crime involving moral turpitude" within five years of his lawful entry into the United States. We deny his petition for review of the final order of deportation.

## I

### BACKGROUND

A citizen of the Dominican Republic, Cabral was allowed to enter the United States as a resident alien on July 21, 1983. On December 14, 1984, he was charged with murder after the Boston police stopped a van containing Cabral, two other men, and a corpse wrapped in a carpet. Cabral later pled guilty as an accessory after the fact to murder, *see* Mass.Gen.Laws ch. 274, § 4 (1990), and received a four-to-seven year prison term.[1] During the deportation proceedings which followed, Cabral contended, as he does now, that the crime of accessory after the fact to murder is not a "crime

1. No one has been convicted of the murder.

involving moral turpitude" (or "CIMT") within the meaning of 8 U.S.C. § 1251(a)(4).[2] An Immigration Judge (IJ) found that Cabral's conviction as an accessory after the fact to the voluntary murder charged in the Massachusetts indictment established that Cabral was an accessory to a CIMT. *See In re Sanchez–Marin,* 11 I. & N.Dec. 264 (BIA1965). The IJ accordingly ordered deportation under section 1251(a)(4). The Board of Immigration Appeals (BIA) affirmed the order of deportation, and Cabral petitioned for review.

## II

## DISCUSSION

### A. *Standard of Review*

 As the petition for review presents a pure issue of statutory construction, we review *de novo,* according due deference to the BIA's interpretation of the deportation statute. *Mosquera–Perez v. INS,* 3 F.3d 553, 554 (1st Cir.1993). *See Jaramillo v. INS,* 1 F.3d 1149, 1153 (11th Cir.1993); *see also INS v. Jong Ha Wang,* 450 U.S. 139, 101 S.Ct. 1027, 67 L.Ed.2d 123 (1981) (per curiam) (pre-*Chevron* case overturning court of appeals' decision reversing "reasonable" INS interpretation of statute). We look first to the language of the statute itself, employing traditional tools of statutory construction, *see Mosquera–Perez,* 3 F.3d at 554–55, to see if the legislative intent is clear, *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). We look to the legislative history only if "the literal words of the statute create ambiguity or lead to an unreasonable interpretation." *United States v. Charles George Trucking Co.,* 823 F.2d 685, 688 (1st Cir.1987) (citation omitted). Where Congress has not spoken directly to the issue, the interpretation given by the BIA is entitled to deference unless arbitrary, capricious, or manifestly contrary to the statute. *See Mosquera–Perez,* 3 F.3d at 555; *see also Alvares–Flores v. INS,* 909 F.2d 1, 3 (1st Cir.1990). In all events, as the final authori-

ty in matters of statutory interpretation, the courts " 'must reject administrative constructions which are contrary to clear congressional intent.' " *Mosquera–Perez,* 3 F.3d at 555 (quoting *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9).

### B. *The Deportation Statute*

### (i) *The Statutory Language*

Section 1251(a)(4) itself states in relevant part:

> **(a) General classes.** Any alien in the United States ... shall, upon the order of the Attorney General, be deported who—
>
> . . . .
>
> (4) is convicted of a crime involving moral turpitude committed within five years after entry and either sentenced to confinement or confined therefor in a prison or corrective institution, for a year or more. . . .

8 U.S.C. § 1251(a)(4). All preconditions for deportation under section 1251(a)(4) are plainly met in the present case, save possibly the CIMT requirement. As to whether an accessory after the fact to murder has committed a CIMT, however, the language of the statute is silent. We therefore look to its legislative history.

### (ii) *The Legislative History*

The available legislative history reveals that the term "moral turpitude" first appeared in the federal immigration laws in 1891. *See* S.Rep. No. 1515, 81st Cong., 2d Sess. 350 (1950); Charles Gordon, *Immigration Law and Practice* § 71.05[1][a], 71–121 (Supp.1993). Justice Jackson offered the following insight into the legislative history of the Immigration Act of 1917, *see* S.Rep. No. 352, 64th Cong., 1st Sess. 390 (1916), the first to authorize deportation of resident aliens convicted of a "crime involving moral turpitude":

> The uncertainties of this statute do not originate in contrariety of judicial opinion. Congress knowingly conceived it in confusion. During the hearings of the House Committee on Immigration, out of which

---

2. This section was redesignated in 1990 as 8 U.S.C. § 1251(a)(2)(A)(i) by Pub.L. No. 101–649

§ 601(a), 104 Stat. 5067–85 (1990).

eventually came the Act of 1917 in controversy, clear warning of its deficiencies was sounded and never denied.

> "Mr. SABATH.... [Y]ou know that a crime involving moral turpitude has not been defined. No one can really say what is meant by saying a crime involving moral turpitude...."

Despite this notice, Congress did not see fit to state what meaning it attributes to the phrase "crime involving moral turpitude."

*Jordan v. De George,* 341 U.S. 223, 233–34, 71 S.Ct. 703, 709, 95 L.Ed. 886 (1951) (Jackson, J., dissenting) (quoting from House Committee on Immigration and Naturalization Hearings on H.R.Rep. No. 10384, 64th Cong., 1st Sess. 8 (1916)).[3] The legislative history leaves no doubt, therefore, that Congress left the term "crime involving moral turpitude" to future administrative and judicial interpretation.

### C. *Reasonableness of Agency Interpretation*

■ Although voluntary murder is universally recognized as a CIMT, *see, e.g., De Lucia v. Flagg,* 297 F.2d 58, 61 (7th Cir. 1961), *cert. denied,* 369 U.S. 837, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962), the statutory language and the legislative history are silent as to whether an alien convicted as an accessory after the fact to voluntary murder has committed a CIMT. We therefore inquire whether the agency interpretation was arbitrary, capricious, or clearly contrary to the statute. *See Mosquera–Perez,* 3 F.3d at 555.

We note first that the record establishes, as the IJ found, that Cabral pled guilty as an accessory to voluntary murder. The Massachusetts indictment, part of the record of conviction, *see United States ex rel. Zaffarano v. Corsi,* 63 F.2d 757, 759 (2d Cir.1933) (per curiam) (on rehearing) (holding that "the record of conviction ... mean[s] the charge (indictment), plea, verdict, and sentence"), alleged:

> JOHN DOE ... on or about December 14, 1984, did assault and beat one Nathan Lee Gales, with intent to murder him and by such assault and beating did kill and murder the said Nathan Lee Gales. And that,

> AQUILES [sic] CABRAL,

> afterwards, *well knowing the said John Doe to have committed the felony aforesaid,* did harbor, conceal, maintain and assist the said John Doe, with intent that said John Doe should avoid and escape detention, arrest, trial and punishment.

(Emphasis added.) Under Massachusetts law, murder is defined as "the killing of a human being, with malice aforethought." Mass.Gen.L. ch. 277, § 39 (1990).[4] As the IJ noted, federal courts uniformly have held that voluntary murder is a CIMT, *see, e.g., Fong Haw Tan v. Phelan,* 162 F.2d 663, 664 (9th Cir.1947), *rev'd on other grounds,* 333 U.S. 6, 68 S.Ct. 374, 92 L.Ed. 433 (1948); *see also, e.g., In re Johnson,* 1 Cal. 4th 689, 4 Cal.Rptr.2d 170, 822 P.2d 1317 (1992); *Burleigh v. State Bar of Nevada,* 98 Nev. 140,

---

3. A Senate subcommittee report accompanying the Immigration Act of 1952 relating to the exclusion of aliens convicted of a CIMT notes that the term "moral turpitude" "has not been definitively and conclusively defined by the courts. One INS decision held that 'moral turpitude' is a vague term...." S.Rep. No. 1515, 81st Cong., 2d Sess. 351 (1950). Nevertheless, the Senate subcommittee did not adopt the suggestion that "there be a listing of crimes and circumstances comprehended within the meaning of moral turpitude," *id.* at 353, so as to remove some of the interpretive discretion left to those who must apply the term in excluding aliens. Moreover, although the term has been part of our immigration laws for more than 100 years, Congress has chosen not to define it, either in the deportation or alien exclusion contexts. *See Gordon,* at 71–146 *supra,* § 71.05[1][d].

4. The Cabral indictment alleges that Cabral "well [knew] the said John Doe to have" * * * "assault[ed] and beat[en] [the victim], with intent to murder him and by such assault and beating did kill and murder the [victim]." Massachusetts law provides that "[t]he following words, when used in an indictment, shall be sufficient to convey the meaning herein attached to them. * * * *Murder.*—The killing of a human being, with malice aforethought." Mass.Gen.L. ch. 277, § 39. The relevant distinction, for purposes of the CIMT classification, is between voluntary and involuntary killing, rather than murder and manslaughter. *See De Lucia,* 297 F.2d at 61 ("so long as homicide is voluntary ... no amount of justification can remove it from the class of [CIMTs]"). Thus, Cabral pled guilty as an accessory after the fact to voluntary murder, a CIMT.

643 P.2d 1201, 1204 (1982); *State v. Lee*, 404 S.W.2d 740, 748 (Mo.1966); *In re Noble*, 77 N.M. 461, 461, 423 P.2d 984, 984 (1967) (second degree murder a CIMT). Furthermore, the IJ reasoned, "[i]f the underlying conduct (assault with intent to murder and murder) is found to be turpitudinous, then the secondary offense (accessory) is also one involving moral turpitude. *Matter of Sanchez–Marin*, 11 I. & N.Dec. 264 (BIA1965)." *Aquiles Leonidas Cabral*, Op. Immigr. Judge No. A 38 496 722, at 5–6 (Nov. 18, 1988).

*In re Sanchez–Marin*, 11 I. & N.Dec. 264, involved issues and circumstances similar to those presented here. Three resident aliens were convicted under Massachusetts law; two of manslaughter, *see* Mass.Gen.L. ch. 265, § 13 (1990), and the third as an accessory after the fact, *see* Mass.Gen.L. ch. 274, § 4 (1990), the same "accessory" statute under which Cabral pled guilty. The BIA found it "reasonable to conclude upon the record of conviction that the homicide committed by the aliens was voluntary and consequently this crime involves moral turpitude," *In re Sanchez–Marin*, 11 I. & N.Dec. at 266, and, as to the third alien, that the *"indictment links him to the manslaughter committed by the other two aliens," id.* at 266–67 (emphasis added).

Later, the BIA emphasized the significance of the "indictment linkage," between the underlying crime and the accessory charge in *In re Short*, 1989 WL 331878, 1989 BIA LEXIS 30 (BIA Nov. 16, 1989), where an alien was charged as an accessory to the crime of assault with intent to commit an *unspecified* felony under 18 U.S.C. § 113(b). The IJ determined, *from the indictment against the principal*, that the *principal's* crime was a CIMT. Thereafter, the IJ's ruling that the *accessory* had been convicted of a CIMT was reversed by the BIA. *Id.* 1989 WL 331878, 1989 BIA LEXIS 30, at *11–*12. The BIA distinguished *Sanchez–Marin*: in "that case, the [BIA] was able to look to the principals' conviction records, as we specifically found that the *respondent's (alien's) indictment* linked him to the crime committed by the two principals. [However], no linkage has been established in this case." *Id.* 1989 WL 331878, 1989 BIA LEXIS 30, at *12 (emphasis added).

Cabral challenges the *Sanchez–Marin* rationale itself, noting that accessories *before* the fact under Massachusetts law are subject to the same punishment as the principal, whereas the legislature has prescribed different punishments for the separate crime of accessory *after* the fact.[5] Therefore, he says, whether an alien convicted as an accessory after the fact has committed a CIMT must be determined without regard to the turpitude associated with the primary offense committed by the principal. Thus, he argues, *Sanchez–Marin* is wrongly decided and the INS may not ascribe to an alien the moral turpitude of the principal's crime since an accessory after the fact need have committed no " 'act of baseness, vileness or depravity in the private and social duties which a man owes to his fellow men, or to society in general, contrary to the accepted and customary rule of right ...,' " *Marciano v. INS*, 450 F.2d 1022, 1025 (8th Cir.), *cert. denied*, 405 U.S. 997, 92 S.Ct. 1260, 31 L.Ed.2d 466 (1971) (quoting *Ng Sui Wing v. United States*, 46 F.2d 755, 756 (7th Cir.1931)). Although Cabral correctly asserts that *Sanchez–Marin* is "presumptive ... and bereft of any reasoning or analysis" supporting its conclusion, we do not agree that the BIA's interpretation of section 1251(a)(4) can be ruled unreasonable, arbitrary, or contrary to law.

For present purposes, we accept *arguendo* the premise that the CIMT determination may take into account only the moral turpitude involved in the criminal conduct to which Cabral pled guilty as determined from the record of conviction,[6] including the indict-

---

**5.** Of course, the definition of a CIMT under § 1251(a)(4) is a matter of federal law. *See Babouris v. Esperdy*, 269 F.2d 621, 623 (2d Cir. 1959), *cert. denied*, 362 U.S. 913, 80 S.Ct. 662, 4 L.Ed.2d 620 (1960); *Burr v. INS*, 350 F.2d 87, 90 (9th Cir.1965), *cert. denied*, 383 U.S. 915, 86 S.Ct. 905, 15 L.Ed.2d 669 (1966). We look to state law only to determine the elements of the offense of conviction. *See In re H*, 7 I. & N.Dec. 359, 360 (BIA1956).

**6.** We have explained that the principal reason the INS and reviewing courts do not go beyond

ment, *see Zaffarano,* 63 F.2d at 759. Even so, the BIA found moral turpitude based on the indictment to which Cabral pled guilty, not the indictment against John Doe. *See supra* at p. 6; *see also Sanchez–Marin,* 11 I. & N.Dec. at 266–67. Given Cabral's guilty plea to an indictment alleging that he *knew* that the principal *intentionally* murdered another human being and that Cabral *intentionally* assisted the principal in avoiding detention, trial and punishment, we discern nothing arbitrary, unreasonable, or contrary to law in the BIA's determination that Cabral himself committed a "crime involving moral turpitude." *See Marciano,* 450 F.2d at 1025. To state the question in the context presented is to answer it: Is it unreasonable for the executive agency entrusted by Congress with primary responsibility for the administration of the deportation of resident aliens to find that an alien who knowingly assisted the perpetrator of a brutal murder to avoid detention, trial and punishment, has himself committed a "crime involving moral turpitude"? Although we recognize the force of the countervailing view, we are not persuaded that the BIA's interpretation and application of section 1251(a)(4) can be considered either arbitrary, unreasonable or contrary to law.[7]

We therefore conclude that the petition for review must be denied, as the BIA's interpretation of 8 U.S.C. § 1251(a)(4) is not unreasonable, arbitrary, capricious, or manifest-

ly contrary to the statute, and its application in the present case was not impermissible.

*So Ordered.*

---

the record of conviction is administrative workability:

> If the crime in its general nature is one which in common usage would be classified as a [CIMT], neither the administrative officials in a deportation proceeding nor the courts on review of administrative action are under the oppressive burden of taking and considering evidence of the circumstances of a particular offense so as to determine whether there were extenuating factors which might relieve the offender of the stigma of moral obliquity.

*Pino v. Nicolls,* 215 F.2d 237, 245 (1st Cir.1954), *rev'd on other grounds sub nom. Pino v. Landon,* 349 U.S. 901, 75 S.Ct. 576, 99 L.Ed. 1239 (1955) (per curiam). *Accord Castie v. INS,* 541 F.2d 1064, 1066 n. 5 (4th Cir.1976); *see also Chiaramonte v. INS,* 626 F.2d 1093, 1098 (2d Cir.1980) (unfair to conduct satellite proceeding in forum which may be far removed from original crime scene).

7. Cabral incorrectly contends that *Sanchez–Marin* does not apply here because the principal has never been convicted, whereas in *Sanchez–Marin* the principals pled guilty. First, under Massachusetts law, the principal need not have been convicted in order to convict an accessory after the fact. *See* Mass.Gen.L. ch. 274, § 5 (1990). Second, Cabral's guilty plea collaterally estops him from denying the essential allegations of the indictment, including not only his intentional assistance to the principal but his knowledge that the principal committed voluntary murder. *See Manzoli v. Commissioner,* 904 F.2d 101, 105 (1st Cir.1990) (party to civil action collaterally estopped from relitigating material issue resolved against him in prior criminal action). As the IJ observed, proof that the underlying murder was committed would have been essential had Cabral gone to trial. *See Commonwealth v. Eagan,* 357 Mass. 585, 259 N.E.2d 548, 551 (1970).