USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 94-1479 ROBERT AND JENNIFER GRUNBECK, Plaintiffs, Appellants, v. THE DIME SAVINGS BANK OF NEW YORK, FSB, Defendant, Appellee.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Paul J. Barbadoro, U.S. District Judge] ___________________  ____________________ Torruella, Chief Judge, ___________ Campbell, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________  ____________________ Jewel N. Klein, with whom Holstein, Mack & Klein, George P. ________________ ________________________ _________ Dickson and Law Offices of George Dickson were on brief for _______ _________________________________ appellants. Douglas G. Verge, with whom Richard P. Hazelton and Sheehan, _________________ _____________________ ________ Phinney, Bass & Green were on brief for appellee. _____________________  ____________________ January 23, 1996  ____________________ CYR, Circuit Judge. The interesting issue of first CYR, Circuit Judge _____________ impression presented in this case is whether section 501(a)(1) of the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 U.S.C. 1735f-7a(a)(1) (1988) ("Monetary Control Act"), preempts New Hampshire Rev. Stat. Ann. 397-A:14(I) (West Supp. 1994) ("Simple Interest Statute" or "SIS"). In a thought- ful and comprehensive opinion, the district court ruled that the Simple Interest Statute, as applied to a residential mortgage loan permitting negative amortization, is preempted by section 501(a)(1).  I I BACKGROUND BACKGROUND __________ On January 15, 1988, Dime Real Estate Services - New Hampshire, Inc. ("Dime Real Estate NH") made a thirty-year adjustable rate loan to Timothy Ray and Thomas F. Richards in the approximate amount of $111,000, secured by a first mortgage on their residence in Milford, New Hampshire. Dime Real Estate NH, incorporated in New York and licensed to extend loans in New Hampshire, is a wholly-owned subsidiary of Dime Savings Bank of New York, FSB ("Dime Savings"), a federally-chartered savings institution also incorporated in New York. The Ray and Richards note, which contained a provision permitting negative amortiza- tion, was assigned to Dime Savings the day it was made. The interest rate was fixed at 7.75% for the first six months, adjustable monthly thereafter at a margin of 3% above the "monthly median cost of funds" ratio, as determined by the 2 Federal Home Loan Bank Board ("FHLBB"), and rounded to the nearest one-eighth of one percentage point. The interest rate was capped, by agreement, at 9.75% for the second six months, and 13.875% thereafter. The note afforded protection from unantici- pated variable interest rate increases by permitting the borrower to pay either the total principal and interest due for the month, ______ or a lower "minimum required payment amount." In the event the __ _____ borrower elected to make the lower "minimum required payment," however, the interest remaining unpaid for that month would be added onto the loan principal, resulting in "negative amortiza- tion," and the interest due the following month would be calcu- lated on the basis of the higher adjusted loan principal.  On October 31, 1990, Ray and Richards conveyed their Milford residence, subject to the Dime Savings mortgage, to appellants Robert and Jennifer Grunbeck, who occupied it as their principal residence. After the Grunbecks ceased payments on the mortgage in 1993, Dime Savings instituted foreclosure proceed- ings. The Grunbecks responded with an Ex Parte Petition for Injunctive Relief in New Hampshire state court, claiming, inter _____ alia, that the negative amortization provision "compounded" ____ interest and, therefore, violated the Simple Interest Statute.1  ____________________ 1The Simple Interest Statute provides:  Any first mortgage home loan made under the provisions of this chapter [Chapter 397-A: Licensing of Nondepository First Mortgage Bankers and Brokers of Title 35 Banks and Banking; Loan Associations; Credit Unions] shall provide for the computation of interest on a simple interest basis.  3 Dime Savings promptly removed the case to federal district court, see 28 U.S.C. 1441, 1446; see also id. 1332 (diversity ___ ___ ____ ___ jurisdiction), then moved to dismiss on the ground, amongst others,2 that section 501(a)(1) of the Monetary Control Act preempts the Simple Interest Statute. In due course the district court entered judgment for Dime Savings, see Grunbeck v. Dime ___ ________ ____ Sav. Bank of New York, FSB, 848 F. Supp. 294, (D.N.H. 1994), and __________________________ the Grunbecks appealed. II II DISCUSSION DISCUSSION __________ A. Standard of Review A. Standard of Review __________________ We review Rule 12(b)(6) dismissals de novo, crediting __ ____ all well-pleaded allegations. Clarke v. Kentucky Fried Chicken ______ ______________________ of Cal., Inc., 57 F.3d 21, 22 n.1 (1st Cir. 1995). For present _____________ purposes, therefore, we accept the allegation that the negative amortization provision in the loan agreement "compounds" interest and thus contravenes the Simple Interest Statute. Accordingly,  ____________________ N.H. Rev. Stat. Ann. 397-A:14(I).  2Dime Savings presented additional defensive claims below, including that (1) the SIS is preempted by 804(c) of the  Alternative Mortgage Transaction Parity Act of 1982, 12 U.S.C.  3803(c) (1988), (2) the negative amortization provision in the Dime Savings note does not "compound" interest and, therefore, does not violate the SIS, and 3) for various reasons, the Grun- becks lack "standing" to challenge the SIS. The district court bypassed these claims, and dismissed on the Monetary Control Act preemption ground. Grunbeck v. Dime Sav. Bank of New York, FSB, ________ ________________________________ 848 F. Supp. 294, 296 n.2 (D.N.H. 1994). We do not address these claims. In particular, we bypass the "standing" claim because the undeveloped record does not enable its reliable determina- tion.  4 we turn to consider whether the statute, so construed, is pre- empted by section 501(a)(1).3  B. Monetary Control Act Preemption B. Monetary Control Act Preemption _______________________________ Congress' power to preempt state law derives from the Supremacy Clause of the United States Constitution. E.E.O.C. v. ________ Massachusetts, 987 F.2d 64, 67 (1st Cir. 1993). "[I]n any _____________ preemption analysis, 'the question of whether federal law pre- empts a state statute is one of congressional intent.'" Green- ______ wood Trust Co. v. Massachusetts, 971 F.2d 818, 823 (1st Cir. _______________ _____________ 1992), cert. denied, 113 S. Ct. 974 (1993) (quoting French v. Pan _____ ______ ______ ___ Am Express, Inc., 869 F.2d 1, 2 (1st Cir. 1989)). Although the ________________ preemption power is not liberally exercised by Congress, id. ___ (citing Gregory v. Ashcroft, 111 S. Ct. 2395, 2400 (1991)), if a ________ ________ federal statute includes an express preemption provision the court need only determine its scope. Id. (citing Cipollone v. ___ _________ Liggett Group, Inc., 112 S. Ct. 2608, 2618 (1992)).  ___________________ 1. Rules of Construction 1. Rules of Construction _____________________ The scope of an express preemption provision is gleaned, first and foremost, from the language of the federal statute, employing traditional rules of statutory construction.  ____________________ 3The district court construed the SIS as a ban on "compound interest," or "charg[ing] interest on interest." Grunbeck, 848 ________ F. Supp. at 296 n.2, 298-300, 302-03. The parties do not dispute its construction. In addition, the State of New Hampshire asserted in its amicus memorandum below, that "The New Hampshire Banking Department has construed the [SIS] as banning regulated mortgage companies from using any computational method other than simple interest in loan products including, specifically, assessments of interest on deferred interest unless the practice is permitted by overriding federal law."  5 CSX Transp., Inc. v. Easterwood, 113 S. Ct. 1732, 1737 (1993) _________________ __________ ("If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."). Of course, if the statutory language is ambiguous, Burlington N. R.R. Co. v. ________________________ Oklahoma Tax Comm'n, 481 U.S. 454, 461 (1987), or would work an ___________________ unreasonable result, we may consult relevant legislative history, Cabral v. INS, 15 F.3d 193, 194 (1st Cir. 1994), to confirm an ______ ___ interpretation indicated by the plain language. Strickland v. __________ Commissioner, Maine Dep't. of Human Servs., 48 F.3d 12, 17 (1st ___________________________________________ Cir.), cert. denied, 116 S. Ct. 145 (1995), (citing INS v.  ____ ______ ___ Cardoza-Fonseca, 480 U.S. 421, 432-43, 446 (1987)).  _______________ Where Congress has spoken directly to the issue, an interpretation rendered by the agency responsible for administer- ing the statute is entitled to no special deference. Chevron, ________ U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. ____________ _______________________________________ 837, 842 (1984). In all events, the courts will reject an agency interpretation which conflicts with congressional intent. Id. at __ 843 n.9. Finally, we attribute "ordinary meaning" to plain statutory terms, see Greenwood Trust, 971 F.2d at 824 (citing ___ _______________ Morales v. Trans World Airlines, Inc., 112 S. Ct. 2031, 2036 _______ ____________________________ (1992)), but may reject an express preemption claim absent a sufficiently clear license to trespass on state sovereignty. See ___ E.E.O.C., 987 F.2d at 68 (citing Gregory, 111 S. Ct. at 2401).  ________ _______ The Monetary Control Act preemption provision relied 6 upon by the district court states in relevant part: The provisions of the constitution or laws of ____ any State expressly limiting the rate or _________ ________ ___ ____ __ amount of interest, discount points, finance ______ __ ________ charges, or other charges which may be _____ ___ __ charged, taken, received, or reserved shall _______ _____ not apply to any loan, mortgage, credit sale, ___ _____ __ ___ ____ ________ or advance which is  _____ __ (A) secured by a first lien on _______ __ _ _____ ____ __ residential real property . . .; ___________ ____ ________ (B) made after March 31, 1980; and (C) described in section 527(b) of the National Housing Act . . . .  12 U.S.C. 1735f-7a(a)(1) (emphasis added).4 Like the district court, see Grunbeck, 848 F. Supp. at 297-98, the parties focus ___ ________ their preemption analyses primarily on the phrase "limiting the rate or amount of interest."  As Dime Savings views the matter, the SIS plainly "limits" the "rate or amount of interest" received in the sense that more interest would be paid by the borrower were "compound- ____ ing" not banned under the SIS; and the SIS effectively "limits" the "amount" of interest the lender can recover in the sense that the lender could earn more interest were it permitted to charge interest at the same "rate" calculated on a compound basis. ____ __________ __ _ ________ _____ These arguments rest on the implicit premise that the "amount" of interest the lender may charge is "limited" by the SIS. On the contrary, the SIS imposes no restriction on either the "rate" or the "amount" of interest the borrower may be charged, but merely requires that any interest rate or amount ___  ____________________ 4The Grunbecks do not dispute that the Dime Savings mortgage loan meets the three criteria set out in s (A)-(C). Grunbeck, ________ 848 F. Supp. at 297 n.4.  7 agreed to by the parties be computed on a "simple interest" ________ basis. Thus, nothing in the SIS prevents a lender from contract- ing for whatever simple interest rate will exact an interest ______ return equal to or greater than whatever rate and amount of interest would be recoverable through compounding. The SIS leaves entirely to the parties the rate and amount of simple interest to be exacted.  The Dime Savings interpretation blurs the distinction between the terms "rate" and "amount" of interest, as used in section 501(a)(1). It assumes that the central question  _______ whether the SIS limits the "rate" of interest is to be re-  ______ solved through reference to the effect the SIS ban against ______ charging interest on interest might have upon the "amount" of interest the lender may be able to command in the marketplace. ___ ______ ___ __ ____ __ _______ __ ___ ___________ Not only does this assumption implicitly acknowledge that the SIS itself imposes no statutory limit on the simple interest "rate" _________ _____ lenders may charge, but it alters the fundamental focus of the preemption debate by inquiring whether the SIS might make it more difficult for lenders to command in a better-informed market- place (i.e., wherein a "simple interest" calculation is mandato- ry) either the rate or amount of interest otherwise obtainable by "compounding."5   ____________________ 5As the district court observed, "without being able to charge interest on interest, many lenders would not allow poten- tial borrowers to defer accrued interest." Grunbeck, 848 F. ________ Supp. at 299. In other words, many lenders might choose not to ______ compensate by increasing the simple interest rate, and might not permit borrowers to defer interest payments on which no interest ______ could be charged. Although unimpeachable, these considerations 8 No less importantly, the shift in analytic focus attending the Dime Savings' assumption undermines the required "plain language" interpretation, see Morales v. Trans World ___ _______ ____________ Airlines, Inc., 504 U.S. 374, 383-84 (1992), by extirpating  ______________ from the pivotal section 501(a) clause: "expressly limiting the rate or amount of interest" the important modifier "express- ly." Thus, the preemption inquiry urged by Dime Savings would focus not on whether the "express" language of the SIS "limit[s]" the rate or amount of interest which the lender may charge, but on broad-gauged assessments concerning the likely impact the SIS ______ ban on compounding would have on home-mortgage lenders and the industry at large.  When engaged in the task of statutory interpretation, "[c]ourts . . . should . . . attempt to give meaning to each word and phrase." See United States v. Flores, 968 F.2d 1366, 1371 ___ ______________ ______ (1st Cir. 1992). Thus, in our view the district court mistakenly inquired whether the SIS ban against charging interest on inter- est could affect the amount of interest lenders might command in _____ ______  ____________________ are inapposite to the present discussion. First, were a lender to opt not to permit deferments of interest payments, it nonetheless would receive both the rate and amount of simple interest for which it contracted on all monies loaned. Second, in any such transaction it could not be said that the SIS, either directly or effectively, limited the legal ___ rate or amount of interest chargeable by the lender. To be sure, lenders who chose not to offset the SIS ban by raising the simple interest rate, or chose not to permit deferments of interest payments, would realize less total interest income as a result of their lending decision. But as the State noted in its amicus memorandum below, "[t]o the extent that this requirement may affect the total amount of interest potentially realizable under the Dime [Savings] loan, such effect is incidental to the re- quirement and cannot be viewed as an 'express' usury ceiling."  9 the marketplace, thereby not only eliding the term "expressly" but overlooking the term "limiting" however defined.6 Moreover, the language Congress employed in section 501(a)(1) "expressly limiting the rate or amount of interest" contrasts sharply with the preemption language in companion section 521 of the Monetary Control Act, whereby Congress pre- empted all state legislation "with respect to interest rates" in ____ _______ __ order to protect federally insured State-chartered banks from State regulation of credit card transactions. See 12 U.S.C.  ___ 1831d(a) (emphasis added). See also Greenwood Trust, 971 F.2d at ___ ____ _______________ 830 n.10 ("[S]ection 501 addresses different categories of lenders and loans and contains materially different preemption terms than does section 521."). Thus, it is important to recog-  ____________________ 6In parsing the 501(a)(1) text, the district court recog- nized that the parties' differing views as to the significance of the term "limiting" accounted for their widely divergent inter- pretations. The court observed that "Dime [Savings] essentially construes 'limiting' as an adjective meaning 'serving to restrict or restrain.' . . . The Grunbecks and the State ... essentially construe 'limiting' as a verb meaning to impose a 'final, utmost or furthest boundary' on permissible interest rates or amounts." Grunbeck, 848 F. Supp. at 298.  ________ In our view, however, the plain statutory language cannot be read as Dime Savings suggests, without ignoring the term "ex- ________ pressly," see Flores, 968 F.2d at 1371, and without disregarding ___ ______ ____________ the "ordinary meaning" of the term "limiting," see Greenwood ___ _________ Trust, 971 F.2d at 824. The SIS itself, as distinguished from _____ __ _____________ ____ market forces, does not "serve to . . . restrain" either the rate ______ ______ or amount of simple interest which may be obtained, since the lender remains free to compensate by increasing the simple interest rate. Thus, the SIS does not "expressly" limit "the rate or amount of interest." Nor, in the alternative, does the SIS as distinguished from market forces "limit" the rate or _____________ ____ ______ ______ amount of interest if "limit" means a "final, utmost or furthest boundary" on the rate or amount of interest, since the SIS imposes no ceiling whatsoever on either the rate or amount of _______ simple interest that may be exacted.  10 nize that the Congress which enacted the Monetary Control Act was acutely aware that its choice of the distinctive terminology  "expressly limiting" would serve as the primary interpretive tool through which its preemptive intent would be revealed to the courts. See BFP v. Resolution Trust Corp., 114 S. Ct. 1757, 1761 ___ ___ ______________________ (1994) (Congress is presumed to act with intent and purpose when it uses particular language in one section of a statute and not in another.).7   ____________________ 7The district court drew encouragement for its preemption ruling from "[p]revious interpretations of similar language in similar legislation," with particular reference to the National Bank Act of 1864, ch. 106, 13 Stat. 99 (codified as amended in various sections of Title 12, United States Code). Grunbeck, 848 ________ F. Supp. at 300. Section 85 of the National Bank Act provided that "a bank may charge 'interest at the rate allowed by the laws of the State, . . . where the bank is located and no more.'" Citizens' Nat'l Bank of Kansas City v. Donnell, 195 U.S. 369, 373 ___________________________________ _______ (1904). Section 86 stated that "taking, receiving, or charging 'a rate of interest greater than is allowed by the preceding section, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon.'" Id.  ___ The district court expressed the view that Donnell supports _______ a broad reading of 501(a)(1), in two respects. First, it offers persuasive support for con- struing "laws limiting the rate or amount of interest" to include laws prohibiting com- pound interest. . . . Second, it indicates that such laws also qualify as state "usury laws" which the title to 501(a)(1) indi- cates Congress intended to preempt. Grunbeck, 848 F. Supp. at 301. We think the district court ________ misapprehended the purport of Donnell, as well as its bearing _______ upon the question before us.  First, the National Bank Act is largely inapposite to 501 501 of the Monetary Control Act. In drafting 501, Congress did not borrow language from the National Bank Act. On the other hand, Congress did borrow language from the National Bank Act in drafting 521 of the Monetary Control Act. Greenwood Trust, 971 521 _______________ F.2d at 827. "[S]ection 521 was conceived as an offspring of 11 2. Legislative History  2. Legislative History  ___________________ Even assuming ambiguity in the phrase "expressly limiting the rate or amount of interest," see Cabral, 15 F.3d at ___ ______ 194, relevant legislative history clearly reflects a congres- sional intention to confine the scope of section 501(a)(1) preemption to state laws which impose express ceilings on the ________ rate or amount of interest which may be charged, as distinguished from bans against charging interest on interest or compounding. ____ The legislative aim in enacting section 501 focused on "state usury ceilings," S. Rep. No. 368, 96th Cong., 2d Sess. 18-19, ________ reprinted in 1980 U.S.C.C.A.N. 236, 254-55 (emphasis added), with _________ __ particular emphasis on state usury laws which restrict interest rates to below-market levels and result in artificial disruptions ____________ __________ ___________ in the supply of home-loan mortgage funds. The Committee finds that where state usury laws require mortgage rates below market levels of interest, mortgage funds in those states will not be readily available and those funds will flow to other states where  ____________________ section 85 of the Bank Act . . . ." Id. at 830 n.10. Thus, the ___ Monetary Control Act includes two separate and dramatically different preemption provisions. Id. Consequently, an interpre- __ tation of the progenitor of 521, i.e., the National Bank Act, 521 affords little, if any, insight into the 501 preemption provi- 501 sion at issue in the present case. Second, Donnell is _______ inapposite to the present inquiry not only because it construed an unrelated statute 85 of the National Bank Act but because the SIS does not "expressly limit[] the rate or amount of _________ interest" even assuming that a ban against compounding can be ___ considered a limitation on the rate of interest "allowed by the __________ laws of the State . . . ." Donnell, 195 U.S. at 373. Indeed, it _______ is surpassingly awkward to ascribe meaning to the term "express- ly" if the SIS ban against compounding is considered an "ex- ___ ___ press[] limit[ation on] the rate or amount of interest" which may _____ ___________ ____ __ ______ be charged, since no rate or amount of "interest on interest" may __ be charged under the SIS. 12 market yields are available. This artificial disruption of funds availability not only is harmful to potential homebuyers in states with usury laws, it also frustrates national housing policies and programs.   Id. at 254. Congress thus sought to facilitate first-mortgage ___ home loans at market rates, in order to enable an adequate credit supply and strengthen the financial system.  In addition to the adverse effects of usury ceilings on credit availability, mort- _____ ________ gage rate ceilings must be removed if savings ________ and loan institutions . . . are to begin to pay market rates of interest on savings de- posits. Without enhancing the ability of institutions to achieve market rates on both sides of their balance sheets, the stability and continued viability of our nation's fi- nancial system would not be assured.  Id. at 255 (emphasis added).  ___ The district court correctly noted that Congress intended to preempt state laws imposing usury ceilings, Grunbeck, ________ ________ 848 F. Supp. at 299, but nonetheless concluded that "the [SIS] . . . would limit the availability of mortgage funds in a way __ _ ___ comparable to a numerical cap on interest rates." Id. (emphasis __________ __ ___ added). True, demand for home mortgage credit could be reduced were lenders to decline to defer interest payments, even though the SIS does not place a ceiling on simple interest rates. But though potential homebuyers might borrow less (or not at all) were lenders to decline to defer interest payments or demand too high a rate or amount of simple interest for doing so, the potential homebuyer's decision would be the result of market forces, the phenomenon Congress set out to facilitate in its ___ __________ ________ ___ ___ __ __________ __ ___ enactment of section 501(a)(1). That is to say, the SIS ban _________ __ _______ _________ 13 against charging interest on interest would neither "require _______ mortgage rates below market levels of interest," nor cause _____ "artificial disruption in funds availability." See 1980 U.S.C.- __________ ___ C.A.N. at 254 (emphasis added).  Moreover, market adjustments in simple interest rates, which New Hampshire home mortgage lenders are free to adopt under the SIS, tend to promote equilibrium between credit supply and credit demand. In contrast, lenders may be forced from a credit ______ marketplace governed by interest rate ceilings where the only ________ alternative is to make loans at interest rates below the levels obtainable in competing loan markets. Credit supply is artifi- __ _______ cially disrupted in such a lending environment because credit ______ _________ demand tends to go unmet where borrowers are attracted by below- ______ market interest rates but lenders are not. As a result, credit ___ _______ ___ ___ demand and credit supply are less likely to attain equilibrium at the usury-ceiling level. In these respects at least, a ban on compounding is in no sense comparable to a mortgage interest rate ceiling.8 Thus, an outright ban against charging interest on  ____________________ 8As a "[p]revious interpretation of similar language in similar legislation," the district court cited to "Fourchon, Inc. ______________ v. Louisiana Nat'l Leasing Corp., 723 F.2d 376, 381-83 (5th Cir. _____________________________ 1984) (construing phrase 'rate of interest' in [ 926(d) of the] Preferred Ship Mortgage Act in accordance with previous construc- tion of similar phrase in National Bank Act to preempt state law prohibiting charging of interest on interest)." Grunbeck, 848 F. ________ Supp. at 300. But the policies subserved by 926(d) of the Preferred Ship Mortgage Act are much broader than those underly- ing 501 of the Monetary Control Act. "The Preferred Ship Mortgage Act was designed to avoid parochial limitations on the ready availability of credit to the shipping industry by wholly ______ and completely superseding state law and practice in every ___ __________ ___________ respect." Fourchon, 723 F.2d at 387 (Shaw, J., dissenting) ________ (emphasis added). "[T]he policies behind the Preferred Ship 14 interest does not work the adverse effects on the credit market- place which concerned Congress in section 501(a)(1), viz., artificial disruptions in credit availability caused by State __________ ceilings on interest rates resulting in below-market rates. ________ ____________ Accordingly, we believe the relevant legislative history provides sturdy support for the view that the important modifier "express- ly" may not be read out of section 501(a)(1) and the term "limit- ing" is not to be equated with "banning."  Congress also signaled its narrow preemptive intent under section 501(a)(1) by insulating these mortgage loans from state usury limitations only, and not from other state-law _____ ___________ ____ limitations encompassed within the "annual percentage rate" nor other state-law limitations designed to protect borrowers: In exempting mortgage loans from state usury limitations, the Committee intends to exempt only those limitations that are included in the annual percentage rate. The Committee does not intend to exempt limitations on prepayment charges, attorney fees, late char- ges or similar limitations designed to pro- __ _______ ___________ ________ __ ____ tect borrowers.  ____ _________ 1980 U.S.C.C.A.N. at 255 (emphasis added). The district court concluded, without elaboration, that "interest on interest prohibitions . . . are 'included' in the interest rate." Grun- _____ beck, 848 F. Supp. at 300. Dime Savings so contends on appeal, ____  ____________________ Mortgage Act support an expansive interpretation of the term 'rate of interest' in section 926(d)." Fourchon, 723 F.2d at ________ 382. As discussed above, however, see Section B.2, the policies ___ underlying 501 of the Monetary Control Act do not support a broad interpretation of the term "rate or amount of interest." Consequently, the Fourchon interpretation affords little insight ________ into the preemptive intent underlying 501 of the Monetary Control Act.  15 maintaining that the SIS ban against charging interest on inter- est is included in the "annual interest rate." We cannot agree.  In the first place, a ban against compounding interest affords significant consumer protections to homebuyers. Charging interest on deferred interest under a residential mortgage not only increases the "unseen" costs of home ownership but erodes _____ home equity. Moreover, the relevant legislative history address- es "state usury limitations" only. The SIS, on the other hand, ___________ is no mere "limitation" but an outright ban against calculating interest on interest. The ordinary meaning of the term "limit- ing" is either as the district court and Dime Savings view it "serving to restrict or restrain" or as the Grunbecks urge to enforce a "final, utmost or furthest boundary." Id. at ___ 298. But the SIS does not merely "limit," nor does it simply ___ "restrain," compounding; it prohibits it. Thus, the "plain _________ language" interpretation advocated by Dime Savings cannot be endorsed without disregarding the ordinary meanings of the distinctive terms "ban" or "prohibit" and "limit" or "restrain." See Greenwood Trust, 971 F.2d at 824.   ___ _______________ 3. Administrative Regulations and Opinions  3. Administrative Regulations and Opinions  _______________________________________ Congress authorized the FHLBB and its successor, the Office of Thrift Supervision ("OTS"), "to issue rules and regula- tions and to publish interpretations governing the implementation of [section 501]." 12 U.S.C. 1735f-7a(f). Judicial review of an agency's interpretation of the statute it administers impli- cates two preliminary inquiries. Strickland, 48 F.3d at 16 __________ 16 (citing Chevron, 467 U.S. at 842-43). The first is whether _______ Congress has "directly spoken to the precise question at issue." Id. (quoting Chevron, 467 U.S. at 842) (internal quotation marks ___ _______ omitted). If not, we inquire "whether the agency's answer is based on a permissible construction of the statute." Id. (quot- ___ ing Chevron, 467 U.S. at 843) (internal quotation marks omitted). _______ Although we accord deference to the agency's interpretation, the final word on statutory interpretation is for the courts. Chevron, 467 U.S. at 843 n.9 ("The judiciary is the final author- _______ ity on issues of statutory construction and must reject adminis- trative constructions which are contrary to clear congressional intent."). Furthermore, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Id. Where an agency interpreta- ___ tion is based exclusively on its reading of the bare statutory language, no special deference is due. See Strickland, 48 F.3d ___ __________ at 16. Furthermore, if "the statute itself, viewed in connection with the statutory design and the legislative history, reveals an unequivocal answer to the interpretive question, the court's inquiry ends." Id. at 17. __ a. FHLBB Regulations a. FHLBB Regulations _________________ The FHLBB has issued administrative regulations for the implementation of section 501, see 12 C.F.R. Part 590 (1988), ___ which focus upon the effect of interest ceilings on the avail- ________ ability of mortgage credit. "The purpose of this permanent 17 preemption of state interest-rate ceilings applicable to Federal- ________ ly-related residential mortgage loans is to ensure that the availability of such loans is not impeded in states having restrictive interest limitations. . . ." 12 C.F.R. 590.1(b) (emphasis added). The FHLBB has reaffirmed that "[n]othing in this section preempts limitations in state laws on prepayment charges, attorneys' fees, late charges or other provisions designed to protect borrowers." Id. 590.3(c).  ___ A statute that imposes an outright ban against com- pounding does not place a "ceiling" on interest rates or amounts. See supra pps. 12-14. Moreover, assuming it may affect loan ___ _____ demand, a ban against charging interest on interest does not artificially disrupt the availability of home mortgage credit. ____________ _______ See supra at pps. 12-15. Finally, given the commercial reali- ___ _____ ties, it is reasonably clear that the SIS ban against charging interest on interest not only affords important protections to homebuyers but does so without "expressly limiting" interest rates. b. The FHLBB and OTS Opinions  b. The FHLBB and OTS Opinions __________________________ In response to an inquiry in 1984 as to whether "Michi- gan laws regarding the charging of interest on deferred interest" were preempted by section 501, the FHLBB opined that "state laws which would prohibit the charging of [interest on] interest would constitute provisions 'limiting the rate or amount of interest . . . which may be charged. . . .' It is our opinion that such charges are not consumer protection provisions of the type 18 contemplated by 12 C.F.R. 590.2(c) (1984) such as limitations on prepayment charges, attorney's fees and late charges." Op. Off. Gen. Counsel, FHLBB 1097 (November 15, 1984). In 1991, the OTS followed suit with an opinion reaffirming the 1984 FHLBB opinion that a state statute regulating "compounding" is preempt- ed by section 501. Op. Off. Chief Counsel, OTS 91/CC-37 (Aug. 16, 1991). We agree with the district court that these opinions are not controlling. See Grunbeck, 848 F. Supp. at 298 ("Al- ___ ________ though these two opinions unequivocally support [Dime Savings'] reading of 501(a)(1), the regulators have failed to provide any analytical support for [their conclusion]. In this circumstance, absolute deference would be nothing more than blind al- legiance."). The district court's observations are plainly correct. Neither regulatory body tendered a rationale for its _________ opinion. The FHLBB the first to address the question  neither described, nor cited, the Michigan provision to which its opinion related.9 And neither agency parsed the section 501(a)- (1) preemption clause language.  As deference ultimately "depends on the persuasiveness of the agency's position," Strickland, 48 F.3d at 18, we agree __________ that none is due in this instance. The interpretation adopted by  ____________________ 9The OTS indicated that the party requesting its opinion had represented that Michigan has no statute on the subject and that the Michigan provision relating to "interest on interest" origi- nated in uncited caselaw announced around the turn of the centu- ry.  19 these agencies disregarded entirely the term "expressly" which plainly constrains the scope of the section 501(a)(1) preemption clause and overlooked the relevant legislative history explic- itly declaring a congressional intention to preempt state usury- law ceilings as distinguished from bans on compounding  ________ which result in artificial disruptions in home-mortgage loan credit by mandating below-market interest rates. Finally, even ____________ assuming the FHLBB interpretation were apposite to the present discussion, in the respect that the Michigan provision with which it dealt imposed a ban on compounding, there is no explicit indication that either agency considered the significant consumer protections, see supra at 15, afforded by state bans such as ___ _____ the SIS against charging interest on interest. For these and other reasons discussed at length in this opinion, we conclude that the agency interpretation relied on by Dime Savings is unpersuasive and entitled to no deference in the present context. c. The Parity Act c. The Parity Act ______________ The district court rejected the State's argument that passage of the Alternative Mortgage Transaction Parity Act of 1982 ("Parity Act"), 12 U.S.C. 3801 et seq., two years after __ ___ passage of the Monetary Control Act, supports a narrow construc- tion of the preemptive scope of section 501(a)(1). Grunbeck, 848 ________ F. Supp. at 301-02. We nonetheless believe that significant insight can be gleaned from the Parity Act.  The Parity Act preempts State bans on certain "alterna- 20 tive mortgage transactions,"10 by which is meant "all manner of mortgage instruments that do not conform to the traditional fully-amortized, fixed-interest-rate mortgage loan." First _____ Gibraltar Bank, FSB v. Morales, 19 F.3d 1032, 1037 (5th Cir. ____________________ _______ 1994), cert. denied, 115 S. Ct. 204, vacated on other grounds, 42 _____ ______ _______ __ _____ _______ F.3d 895 (5th Cir. 1995) (per curiam). Common forms of "alterna- tive mortgage transactions" include adjustable interest rate mortgages, which may permit negative amortization, and graduated payment mortgages, which may temporarily lower the mortgage payment to less than the monthly interest due, resulting in planned negative amortization whereby interest is charged on the deferred interest. Id. (citing generally to Grant S. Nelson & ___ Dale A. Whitman, Real Estate Transfer, Finance, and Development _______________________________________________ 1000-13 (4th ed. 1992)). Other planned negative amortization  ____________________ 10The term "alternative mortgage transaction" means a residential mortgage loan  (A) in which the interest rate or finance charge may be adjusted or renegotiated; (B) involving a fixed-rate, but which implicitly permits rate ad- justments by having the debt mature at the end of an interval shorter than the term of the amortization schedule; or (C) involving any similar type of rate, method of determining return, term, repayment, or other variation not common to traditional fixed- rate, fixed-term transactions, in- cluding without limitation, trans- actions that involve the sharing of equity or appreciation; described and defined by applicable regula- tion.  12 U.S.C. 3802(1).  21 provisions include the reverse annuity mortgage ("RAM") and the credit conversion mortgage, both of which charge interest on deferred interest. Id. "An alternative mortgage transaction may ___ be made by a housing creditor in accordance with [section 3803], notwithstanding any State constitution, law or regulation." 12 U.S.C. 3803(c). It is a requirement of section 3803 that for "housing creditors [other than banks and credit unions] . . . transactions [must be] made in accordance with regulations governing alternative mortgage transactions as issued by the [OTS] . . . ." Id. 3803(a)(3). These OTS regulations, see 12  ___ ___ C.F.R. 545.33(f)(4)-(11) (1988), impose, inter alia, substan- _____ ____ tial lender disclosure requirements relating to features unique to alternative mortgage transactions.  The State argued below that it would be "'illogical and contrary to public policy'" for Congress to require as a precondition to preemption under the Parity Act that negative amortization loans conform with OTS disclosure regulations "if lenders could claim preemption for the same transactions under [the Monetary Control Act] without making the required disclo- sures." Grunbeck, 848 F. Supp. at 302. Although, as the dis- ________ trict court correctly observed, "[c]onstruing the Monetary Control Act to preempt simple interest laws does not eliminate _________ the incentive for lenders to comply with the Parity Act's disclo- sure requirements," id. (emphasis added),11 it must also be __  ____________________ 11The court explained that "negative amortization provisions are not the only characteristics that qualify a loan as an alternative mortgage transaction," and, further, that "[s]imple 22 noted that negative amortization provisions whereby interest is assessed on deferred interest are common features in various _______ forms of alternative mortgage transactions; e.g., graduated _____ payment mortgages, RAMs, and credit conversion mortgages. Because a ban against charging interest on interest would pre- clude a central feature common to many forms of alternative mortgage transactions, simple interest statutes unquestionably infringe upon alternative mortgage loans, even though they do not impose an outright ban. Thus, as the State contends, construing the Monetary Control Act so as to preempt simple interest laws, such as the SIS, would significantly reduce these alternative ______ mortgage lenders' incentive to comply with the Parity Act disclo- sure requirements. Whether or not illogical, there can be little question that this result would conflict with the policy underly- ing the Parity Act and, thus, with the intent of Congress.  As the district court noted, "the Parity Act and the Monetary Control Act serve related but distinctly different functions." Id. The Parity Act represents a congressional ___ response to a concern, amongst others, that State bans on mort- gages other than traditional fixed-rate mortgages would reduce the overall availability of mortgage credit, since fixed-rate mortgages had become relatively more expensive as the result of increased interest-rate volatility.  The Congress hereby finds that   ____________________ interest laws are merely one of several categories of" state laws "inconsistent with a qualifying lender's right to issue alterna- tive mortgage loans." Id.  ___ 23 (1) increasingly volatile and dy- namic changes in interest rates have seriously impaired the ability of housing creditors to provide consumers with fixed-term, fixed- rate credit secured by interests in real property, cooperative housing, manufactured homes, and other dwel- lings; (2) alternative mortgage transac- tions are essential to the provi- sion of an adequate supply of cred- it secured by residential property necessary to meet the demand ex- pected in the 1980's; . . . . 12 U.S.C. 3801(a). These concerns prompted Congress to autho- rize State-chartered housing lenders, such as Dime Real Estate _____ NH, to enter into alternative mortgage transactions.  It is the purpose of [the Parity Act] to ... provide [nonfederally chartered housing cred- ____________ itors] . . . parity with federally chartered institutions by authorizing all housing cred- itors to make, purchase, and enforce alterna- tive mortgage transactions so long as the transactions are in conformity with the regu- lations issued by the Federal agencies. Id. at 3801(b). See also First Gibraltar Bank, FSB, 19 F.3d at ___ ___ ____ _________________________ 1043. Thus, the purpose of the Parity Act was to preempt State bans on alternative mortgage transactions, including adjustable ____ rate mortgages permitting negative amortization whereby interest may be charged on deferred interest payments.12 In the Monetary Control Act, on the other hand, Con- gress was responding to the very different concern that State  ____________________ 12The parties do not dispute that the Dime Savings loan is an "alternative mortgage transaction," though they disagree whether the loan was made in accordance with OTS regulations. We do not resolve the Dime Savings' Parity Act preemption claim as applied to the present loan, however, since it has not yet been considered by the district court.  24 interest-rate ceilings were depressing home-mortgage interest ________ rates to below-market levels, thereby artificially disrupting the ____________ availability of funds for both traditional fixed-rate mortgages and "alternative mortgage transactions." The latter concern prompted Congress to preempt only state laws "expressly limiting the rate or amount of interest." Thus, section 501(a)(1) of the Monetary Control Act was not aimed at preempting State laws, such as the SIS, which prohibit "alternative mortgage transactions" permitting negative amortization whereby interest may be charged on deferred interest.  III III CONCLUSION CONCLUSION __________ We hold that the New Hampshire Simple Interest Statute, as applied to the Dime Savings loan, is not preempted by section 501(a)(1) of the Monetary Control Act. Consequently, we remand to permit the district court to consider the remaining issues relating to the petition to enjoin foreclosure on the Grunbeck residence.  The judgment is vacated and the case is remanded for The judgment is vacated and the case is remanded for _______________________________________________________ further proceedings consistent with this opinion. Costs are further proceedings consistent with this opinion. Costs are ___________________________________________________ __________ awarded to appellants. awarded to appellants. _____________________ 25