TORRUELLA, Circuit Judge (Concurring in part, dissenting in part). I agree with the majority that 11 U.S.C. § 365(n) does not protect Mission’s exclusive distribution rights or its nonexclusive trademark license. The plain language of this subsection identifies “intellectual property,” which, for purposes of chapter 11, does not encompass trademarks. See 11 U.S.C. § 101(35A). However, I disagree with the majority’s bright-line rule that the omission of trademarks from the protections of section 365(n) leaves a non-rejecting party without any remaining rights to use a debtor’s trademark and logo. As Judge Easterbrook wrote, “an omission is just an omission,” and simply implies that section 365(n) does not determine how trademark licenses should be treated—one way or the other. Sunbeam, 686 F.3d at 375. I would follow the Seventh Circuit and the BAP in finding that Mission’s rights to use Debtor’s trademark did not vaporize as a result of Debtor’s rejection of the executory contract. The majority focuses on the Bankruptcy Code’s protection of debtors’ ability to reorganize and to escape “burdensome obligations.” But, as the majority acknowledges, in some situations, the Bankruptcy Code also provides protections to non-debtor parties of an executory contract, allowing the courts to determine an equitable remedy pursuant to the terms of a rejected contract. See Ohio v. Kovacs, 469 U.S. 274, 280, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985); see also In re Nickels Midway Pier, LLC, 255 Fed.Appx. 633, 637-38 (3d Cir. 2007); Abboud, 482 F.3d at 19. Thus, to determine the effect of a section 365(a) rejection on a trademark license, we look to the plain text of section 365 as a whole, which dictates the parameters of such a rejection of an executory contract. A plain language review reveals section 365’s silence as to the treatment of a trademark license post-rejection. Where a statute is silent, we look to the legislative history for assistance. DiGiovanni v. Traylor Bros., Inc., 75 F.3d 748, 755 (1st Cir. 1996) (citing Cabral v. I.N.S., 15 F.3d 193, 194 (1st Cir. 1994)). Resultantly, our examination leads us back to Congress’s intent when it enacted section 365(n). The Senate Committee report makes clear that Congress enacted section 365(n) as a direct response to the Fourth Circuit’s decision in Lubrizol, 756 F.2d 1043, where the court found that rejection of a contract for an intellectual property license deprived the licensee of all rights previously granted under that license. See S. Rep. No. 100-505, at 2-3. In so doing, Congress intended to “correct[ ] the perception of some courts that Section- 365 was ever intended to be a mechanism -for stripping innocent licensee [sic] of rights central to the operations of their ongoing business.” Id., at 4. Specific to trademark licenses, the Senate Committee report explains that the purposeful omission of trademarks was not designed to leave trademark licensees unprotected, but rather was “designed to allow more time for study, not to approve Lubrizol.” Sunbeam, 686 F.3d at 375. The relevant portion of the Senate report reads: [T]he bill does not address the rejection of executory trademarks],.... While such rejection is of concern because of the interpretation of [§ ] 365 by the Lubrizol, court and others, ... such contracts raise issues beyond the scope of this legislation. In particular, trademark .., relationships depend to a large extent on control of the quality of the products or services sold by the licensee. Since these matters could not be addressed without more extensive study, it was determined to postpone congressional action in this area and to allow the development of equitable treatment of this situation by bankruptcy courts. S. Rep. No. 100-505, at 5. This legislative history expresses congressional concern about the -application of Lubrizol’s holding to trademarks licenses until further studies are done, and, rather than continue to apply Lubrizol’s holding, encourages “equitable treatment” by the courts to resolve disputes arising in the meantime. Id. Why would Congress have provided this guidance. if it. .meant for Lubrizol—the very case Congress rejected—to apply to trademark licenses? Congress has yet to advise the courts about the results of any further studies; as such, the majority’s judicially created bright-line rule contravenes congressional intent. The majority’s view infers that the omission5 of trademarks from section 101(35A)’s definition of “intellectual property,” and therefore the protections of section 365(n), implies that section 365 categorically affords no protections to licensees of trademarks. Yet, Congress’s own interpretation of section 365(n) informs us that the bill does not “address of intend any inference to be drawn concerning the treatment of executory contracts which are unrelated to intellectual property.” Id. “In light of these direct congressional statements of-intent, it is simply more freight than negative inference will bear to read rejection of a trademark license to effect the same result as termination of that license.” In re Exide Techs., 607 F.3d at 967 (Ambro, J., concurring) (citation and internal quotation marks omitted). Instead, like the BAP below, I find it appropriate to view a debtor’s section 365(a) rejection through the broader lens of section 365, as the Seventh Circuit did in Sunbeam. Section 365(g) states that “the rejection of an executory contract or unexpired' lease of the debtor constitutes a breach of such contract or lease.” 11 U.S.C. § 365(g). Similar to other contractual breaches outside of the bankruptcy context, a rejection pursuant to section 365(a) does not automatically terminate a non-rejecting party’s, rights under a contract. Sunbeam, 686 F.3d at 377, Admittedly, “[w]hat the Bankruptcy Code provides, a judge cannot override by declaring that enforcement would be inequitable.” Id. at 375 (internal quotation marks omitted). Given the Bankruptcy Code’s silence as to the poSt-rejeetion rights-that a trademark licensee does or. does not retain, and in accordance with principles governing breaches of contract, we must resolve the dispute by looking to the terms of the contract to which these sophisticated parties agreed, and other applicable non-bankruptcy law. While the majority mistakenly insists that that this approach rejects the one followed in Sunbeam, it is precisely what the Seventh Circuit called for in finding that rejection does not abrogate a contract. Id. at 377. The majority takes Issue with this consideration in what it terms as “some unspecified manner,” but ignores that “the development-of equitable treatment” is precisely what Congress has instructed the courts to do. See S. Rep. No. 100-505, at 6. Instead, the majority’s view that a section 365(a) rejection eliminates a licensee’s rights to the bargained-for use of a debtor’s trademark effectively treats a debtor’s rejection as a contract cancellation, rather than a contractual breach, putting the court at odds with legislative intent. It also “makes bankruptcy more a sword than a shield, putting debtor-li-censors in a catbird seat they often do not deserve.” In re Exide Techs., 607 F.3d at 967-68 (Ambro, J., concurring). I respect my colleagues’ concern that following the Seventh Circuit’s holding that a section 365(a) rejection does not categorically eviscerate the trademark rights that a debtor-licensor bargained away may “require[ ] that the trademark owner—here Debtor—monitor and exercise control over the quality of the goods sold to the public” post-rejection. However, licensees have trademark quality assurance obligations under the terms of their individual contracts which can be enforced through further legal action and the equitable remedy of specific performance. In the current case, Mission’s obligations are laid out in Section 15(d) of the Agreement, which states that, inter alia, Mission shall not use the trademarks in a disparaging or inaccurate manner, shall comply with written trademark guidelines, and shall not create a unitary composite mark. The majority speculates that the remaining burden on the debtor will be too great in the bankruptcy context, and therefore, if it “were in the chancellor’s chair,” it would not follow this approach. However, we need not enter such a debate as it, is not the role of the courts to legislate, as the majority’s approach effectively does, through the creation of bright-line rules in the face of congressional intent. Congress contemplated the majority’s concern when it enacted section 365(n), recognizing “that there may be circumstances in which the future affirmative performance obligations under a license cannot be performed in a manner that benefits the estate.” S. Rep. No. 100-505, at 4-5. The legislative history indicates that treatment of trademark licenses is one such circumstance. Accordingly, the BAP was correct to follow thé Seventh Circuit’s lead in finding that, even though 11 U.S.C. § 365(n) does not provide Mission protection of its license to use Debtor’s trademarks, Debt- or’s rejection of the executory contract does not rescind the Agreement and eviscerate any of Mission’s remaining trademark rights. Instead, as Congress has instructed the bankruptcy courts to do, the effect of Debtor’s rejection on Mission’s trademark license should be guided by the terms of the Agreement, and non-bankruptcy law, to determine the appropriate equitable remedy of the functional breach of contract. I respectfully dissent.