**Robert and Jennifer GRUNBECK, Plaintiffs, Appellants,**

v.

**The DIME SAVINGS BANK OF NEW YORK, FSB, Defendant, Appellee.**

**No. 94–1479.**

United States Court of Appeals, First Circuit.

Heard June 9, 1995.

Decided Jan. 23, 1996.

---

Jewel N. Klein, with whom Holstein, Mack & Klein, Chicago, IL, George P. Dickson and Law Offices of George Dickson, Milford, NH, were on brief for appellants.

Douglas G. Verge, with whom Richard P. Hazelton and Sheehan, Phinney, Bass & Green, Manchester, NH, were on brief for appellee.

Before TORRUELLA, Chief Judge, LEVIN H. CAMPBELL, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

The interesting issue of first impression presented in this case is whether section 501(a)(1) of the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 U.S.C. § 1735f–7a(a)(1) (1988) ("Monetary Control Act"), preempts New Hampshire Rev.Stat.Ann. § 397–A:14(I) (West Supp. 1994) ("Simple Interest Statute" or "SIS"). In a thoughtful and comprehensive opinion,

the district court ruled that the Simple Interest Statute, as applied to a residential mortgage loan permitting negative amortization, is preempted by section 501(a)(1).

# I

## BACKGROUND

On January 15, 1988, Dime Real Estate Services—New Hampshire, Inc. ("Dime Real Estate NH") made a thirty-year adjustable rate loan to Timothy Ray and Thomas F. Richards in the approximate amount of $111,000, secured by a first mortgage on their residence in Milford, New Hampshire. Dime Real Estate NH, incorporated in New York and licensed to extend loans in New Hampshire, is a wholly-owned subsidiary of Dime Savings Bank of New York, FSB ("Dime Savings"), a federally-chartered savings institution also incorporated in New York. The Ray and Richards note, which contained a provision permitting negative amortization, was assigned to Dime Savings the day it was made.

The interest rate was fixed at 7.75% for the first six months, adjustable monthly thereafter at a margin of 3% above the "monthly median cost of funds" ratio, as determined by the Federal Home Loan Bank Board ("FHLBB"), and rounded to the nearest one-eighth of one percentage point. The interest rate was capped, by agreement, at 9.75% for the second six months, and 13.875% thereafter. The note afforded protection from unanticipated variable interest rate increases by permitting the borrower to pay *either* the total principal and interest due for the month, or a *lower* "minimum required payment amount." In the event the borrower elected to make the lower "minimum required payment," however, the interest remaining unpaid for that month would be added onto the loan principal, resulting in "negative amortization," and the interest due the following month would be calculated on the basis of the higher adjusted loan principal.

On October 31, 1990, Ray and Richards conveyed their Milford residence, subject to the Dime Savings mortgage, to appellants Robert and Jennifer Grunbeck, who occupied it as their principal residence. After the Grunbecks ceased payments on the mortgage in 1993, Dime Savings instituted foreclosure proceedings. The Grunbecks responded with an Ex Parte Petition for Injunctive Relief in New Hampshire state court, claiming, *inter alia,* that the negative amortization provision "compounded" interest and, therefore, violated the Simple Interest Statute.[1] Dime Savings promptly removed the case to federal district court, *see* 28 U.S.C. §§ 1441, 1446; *see also id.* § 1332 (diversity jurisdiction), then moved to dismiss on the ground, amongst others,[2] that section 501(a)(1) of the Monetary Control Act preempts the Simple Interest Statute. In due course the district court entered judgment for Dime Savings, *see Grunbeck v. Dime Sav. Bank of New York, FSB,* 848 F.Supp. 294 (D.N.H.1994), and the Grunbecks appealed.

# II

## DISCUSSION

### A. Standard of Review

■ We review Rule 12(b)(6) dismissals *de novo,* crediting all well-pleaded allegations. *Clarke v. Kentucky Fried Chicken of Cal., Inc.,* 57 F.3d 21, 22 n. 1 (1st Cir.1995). For

---

1. The Simple Interest Statute provides:
 Any first mortgage home loan made under the provisions of this chapter [Chapter 397–A: Licensing of Nondepository First Mortgage Bankers and Brokers of Title 35 Banks and Banking; Loan Associations; Credit Unions] shall provide for the computation of interest on a simple interest basis.
 N.H.Rev.Stat.Ann. § 397–A:14(I).

2. Dime Savings presented additional defensive claims below, including that (1) the SIS is preempted by § 804(c) of the Alternative Mortgage Transaction Parity Act of 1982, 12 U.S.C.

§ 3803(c) (1988), (2) the negative amortization provision in the Dime Savings note does not "compound" interest and, therefore, does not violate the SIS, and (3) for various reasons, the Grunbecks lack "standing" to challenge the SIS. The district court bypassed these claims, and dismissed on the Monetary Control Act preemption ground. *Grunbeck v. Dime Sav. Bank of New York, FSB,* 848 F.Supp. 294, 296 n. 2 (D.N.H. 1994). We do not address these claims. In particular, we bypass the "standing" claim because the undeveloped record does not enable its reliable determination.

present purposes, therefore, we accept the allegation that the negative amortization provision in the loan agreement "compounds" interest and thus contravenes the Simple Interest Statute. Accordingly, we turn to consider whether the statute, so construed, is preempted by section 501(a)(1).[3]

## B. Monetary Control Act Preemption

■ Congress' power to preempt state law derives from the Supremacy Clause of the United States Constitution. *E.E.O.C. v. Massachusetts*, 987 F.2d 64, 67 (1st Cir.1993). "[I]n any preemption analysis, 'the question of whether federal law preempts a state statute is one of congressional intent.'" *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 823 (1st Cir.1992), *cert. denied*, 506 U.S. 1052, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993) (quoting *French v. Pan Am Express, Inc.*, 869 F.2d 1, 2 (1st Cir.1989)). Although the preemption power is not liberally exercised by Congress, *id.* (citing *Gregory v. Ashcroft*, 501 U.S. 452, 458–60, 111 S.Ct. 2395, 2400, 115 L.Ed.2d 410 (1991)), if a federal statute includes an express preemption provision the court need only determine its scope. *Id.* (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517–18, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992)).

### 1. Rules of Construction

■ The scope of an express preemption provision is gleaned, first and foremost, from the language of the federal statute, employing traditional rules of statutory construction. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993) ("If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."). Of course, if the statutory language is ambiguous, *Burlington N. R.R. Co. v. Oklahoma*

*Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987), or would work an unreasonable result, we may consult relevant legislative history, *Cabral v. INS*, 15 F.3d 193, 194 (1st Cir.1994), to confirm an interpretation indicated by the plain language. *Strickland v. Commissioner, Maine Dep't. of Human Servs.*, 48 F.3d 12, 17 (1st Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 145, 133 L.Ed.2d 91 (1995), (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432–43, 446, 107 S.Ct. 1207, 1213–19, 1221, 94 L.Ed.2d 434 (1987)).

■ Where Congress has spoken directly to the issue, an interpretation rendered by the agency responsible for administering the statute is entitled to no special deference. *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). In all events, the courts will reject an agency interpretation which conflicts with congressional intent. *Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9. Finally, we attribute "ordinary meaning" to plain statutory terms, *see Greenwood Trust*, 971 F.2d at 824 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 382–83, 112 S.Ct. 2031, 2036, 119 L.Ed.2d 157 (1992)), but may reject an express preemption claim absent a sufficiently clear license to trespass on state sovereignty. *See E.E.O.C.*, 987 F.2d at 68 (citing *Gregory*, 501 U.S. at 460–62, 111 S.Ct. at 2401).

The Monetary Control Act preemption provision relied upon by the district court states in relevant part:

> The provisions of the constitution or *laws* of any State *expressly limiting the rate or amount of interest*, discount points, finance charges, or other charges *which may be charged*, taken, received, or reserved *shall not apply to any loan, mortgage*, credit sale, or advance *which is*—
>
> (A) *secured by a first lien on residential real property* ...;

---

**3.** The district court construed the SIS as a ban on "compound interest," or "charg[ing] interest on interest." *Grunbeck*, 848 F.Supp. at 296 n. 2, 298–300, 302–03. The parties do not dispute its construction. In addition, the State of New Hampshire asserted in its amicus memorandum below, that "The New Hampshire Banking De-

partment has construed the [SIS] as banning regulated mortgage companies from using any computational method other than simple interest in loan products—including, specifically, assessments of interest on deferred interest—unless the practice is permitted by overriding federal law."

(B) made after March 31, 1980; and

(C) described in section 527(b) of the National Housing Act....

12 U.S.C. § 1735f–7a(a)(1) (emphasis added).[4] Like the district court, *see Grunbeck,* 848 F.Supp. at 297–98, the parties focus their preemption analyses primarily on the phrase "limiting the rate or amount of interest."

As Dime Savings views the matter, the SIS plainly "limits" the "rate or amount of interest" received in the sense that *more* interest would be paid by the borrower were "compounding" not banned under the SIS; and the SIS effectively "limits" the "amount" of interest the lender can recover in the sense that the lender could earn more interest were it permitted to charge interest at the *same* "rate" *calculated on a compound basis.*

■ These arguments rest on the implicit premise that the "amount" of interest the lender may charge is "limited" by the SIS. On the contrary, the SIS imposes no restriction on either the "rate" or the "amount" of interest the borrower may be charged, but merely requires that *any* interest rate or amount agreed to by the parties be *computed* on a "simple interest" basis. Thus, nothing in the SIS prevents a lender from contracting for whatever *simple* interest rate will exact an interest return equal to or greater than whatever rate and amount of interest would be recoverable through compounding. The SIS leaves entirely to the parties the rate and amount of simple interest to be exacted.

The Dime Savings interpretation blurs the distinction between the terms "rate" and "amount" of interest, as used in section 501(a)(1). It *assumes* that the central question—whether the SIS *limits* the "rate" of interest—is to be resolved through reference to the *effect* the SIS ban against charging interest on interest might have upon the "amount" of interest *the lender may be able to command in the marketplace.* Not only does this assumption implicitly acknowledge that the SIS itself imposes no *statutory limit* on the simple interest "rate" lenders may charge, but it alters the fundamental focus of the preemption debate by inquiring whether the SIS might make it more difficult for lenders to command—in a better-informed marketplace (i.e., wherein a "simple interest" calculation is mandatory)—either the rate or amount of interest otherwise obtainable by "compounding."[5]

No less importantly, the shift in analytic focus attending the Dime Savings' assumption undermines the required "plain language" interpretation, *see Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383–84, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992), by extirpating—from the pivotal section 501(a) clause: "expressly limiting the rate or amount of interest"—the important modifier "expressly." Thus, the preemption inquiry urged by Dime Savings would focus not on whether the "express" language of the SIS "limit[s]" the rate or amount of interest which the lender may charge, but on broad-gauged assessments concerning the likely *impact* the SIS ban on compounding would

---

4. The Grunbecks do not dispute that the Dime Savings mortgage loan meets the three criteria set out in ¶¶ s (A)–(C). *Grunbeck,* 848 F.Supp. at 297 n. 4.

5. As the district court observed, "without being able to charge interest on interest, many lenders would not allow potential borrowers to defer accrued interest." *Grunbeck,* 848 F.Supp. at 299. In other words, many lenders might *choose* not to compensate by increasing the simple interest rate, and might not *permit* borrowers to defer interest payments on which no interest could be charged. Although unimpeachable, these considerations are inapposite to the present discussion.

First, were a lender to opt not to permit deferments of interest payments, it nonetheless would

receive both the rate and amount of simple interest for which it contracted on all monies loaned. Second, in any such transaction it could not be said that the *SIS,* either directly or effectively, limited the legal rate or amount of interest chargeable by the lender. To be sure, lenders who chose not to offset the SIS ban by raising the simple interest rate, or chose not to permit deferments of interest payments, would realize less total interest income as a result of their lending decision. But as the State noted in its amicus memorandum below, "[t]o the extent that this requirement may affect the total amount of interest potentially realizable under the Dime [Savings] loan, such effect is incidental to the requirement and cannot be viewed as an 'express' usury ceiling."

have on home-mortgage lenders and the industry at large.

■■■ When engaged in the task of statutory interpretation, "[c]ourts ... should ... attempt to give meaning to each word and phrase." *See United States v. Flores*, 968 F.2d 1366, 1371 (1st Cir.1992). Thus, in our view the district court mistakenly inquired whether the SIS ban against charging interest on interest *could affect* the amount of interest lenders might command in the marketplace, thereby not only eliding the term "expressly" but overlooking the term "limiting" however defined.[6]

Moreover, the language Congress employed in section 501(a)(1)—"expressly limiting the rate or amount of interest"—contrasts sharply with the preemption language in companion section 521 of the Monetary Control Act, whereby Congress preempted all state legislation *"with respect to* interest rates" in order to protect federally insured State-chartered banks from State regulation of credit card transactions. *See* 12 U.S.C. § 1831d(a) (emphasis added). *See also Greenwood Trust*, 971 F.2d at 830 n. 10 ("[S]ection 501 addresses different categories of lenders and loans and contains materially different preemption terms than does section 521."). Thus, it is important to recognize that the Congress which enacted the Monetary Control Act was acutely aware that its choice of the distinctive terminology—"expressly limiting"—would serve as the primary interpretive tool through which its preemptive intent would be revealed to the courts. *See BFP v. Resolution Trust Corp.*, — U.S. ——, ——, 114 S.Ct. 1757, 1761, 128 L.Ed.2d 556 (1994) (Congress is presumed to act with intent and purpose when it uses particular language in one section of a statute and not in another.).[7]

---

6. In parsing the § 501(a)(1) text, the district court recognized that the parties' differing views as to the significance of the term "limiting" accounted for their widely divergent interpretations. The court observed that "Dime [Savings] essentially construes 'limiting' as an adjective meaning 'serving to restrict or restrain.' ... The Grunbecks and the State ... essentially construe 'limiting' as a verb meaning to impose a 'final, utmost or furthest boundary' on permissible interest rates or amounts." *Grunbeck*, 848 F.Supp. at 298.

In our view, however, the plain statutory language cannot be read as Dime Savings suggests, without *ignoring* the term "expressly," *see Flores*, 968 F.2d at 1371, and without *disregarding* the "ordinary meaning" of the term "limiting," *see Greenwood Trust*, 971 F.2d at 824. The SIS itself, *as distinguished from market forces*, does not "serve to ... restrain" either the rate or amount of simple interest which may be obtained, since the lender remains free to compensate by increasing the simple interest rate. Thus, the SIS does not "expressly" limit "the rate or amount of interest." Nor, in the alternative, does the SIS—as *distinguished from market forces*—"limit" the rate or amount of interest if "limit" means a "final, utmost or furthest boundary" on the rate or amount of interest, since the SIS imposes no *ceiling* whatsoever on either the rate or amount of simple interest that may be exacted.

7. The district court drew encouragement for its preemption ruling from "[p]revious interpretations of similar language in similar legislation," with particular reference to the National Bank Act of 1864, ch. 106, 13 Stat. 99 (codified as amended in various sections of Title 12, United States Code). *Grunbeck*, 848 F.Supp. at 300. Section 85 of the National Bank Act provided that "a bank may charge 'interest at the rate allowed by the laws of the State, ... where the bank is located and no more.'" *Citizens' Nat'l Bank of Kansas City v. Donnell*, 195 U.S. 369, 373, 25 S.Ct. 49, 50, 49 L.Ed. 238 (1904). Section 86 stated that "taking, receiving, or charging 'a rate of interest greater than is allowed by the preceding section, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon.'" *Id.*

The district court expressed the view that *Donnell* supports a broad reading of § 501(a)(1), in two respects.

> First, it offers persuasive support for construing "laws limiting the rate or amount of interest" to include laws prohibiting compound interest.... Second, it indicates that such laws also qualify as state "usury laws" which the title to § 501(a)(1) indicates Congress intended to preempt.

*Grunbeck*, 848 F.Supp. at 301. We think the district court misapprehended the purport of *Donnell*, as well as its bearing upon the question before us.

First, the National Bank Act is largely inapposite to § 501 of the Monetary Control Act. In drafting § 501, Congress did not borrow language from the National Bank Act. On the other hand, Congress did borrow language from the National Bank Act in drafting § 521 of the Monetary Control Act. *Greenwood Trust*, 971 F.2d at 827. "[S]ection 521 was conceived as an offspring of section 85 of the Bank Act...." *Id.* at 830 n. 10. Thus, the Monetary Control Act in-

## 2. *Legislative History*

 Even assuming ambiguity in the phrase "expressly limiting the rate or amount of interest," *see Cabral,* 15 F.3d at 194, relevant legislative history clearly reflects a congressional intention to confine the scope of section 501(a)(1) preemption to state laws which impose express *ceilings* on the rate or amount of interest which may be charged, as distinguished from *bans* against charging interest on interest or compounding. The legislative aim in enacting section 501 focused on "state usury *ceilings,*" S.Rep. No. 368, 96th Cong., 2d Sess. 18–19, *reprinted in* 1980 U.S.C.C.A.N. 236, 254–55 (emphasis added), with particular emphasis on state usury laws which restrict interest rates to *below-market* levels and result in *artificial disruptions* in the supply of home-loan mortgage funds.

> The Committee finds that where state usury laws require mortgage rates below market levels of interest, mortgage funds in those states will not be readily available and those funds will flow to other states where market yields are available. This artificial disruption of funds availability not only is harmful to potential homebuyers in states with usury laws, it also frustrates national housing policies and programs.

*Id.* at 254. Congress thus sought to facilitate first-mortgage home loans at market rates, in order to enable an adequate credit supply and strengthen the financial system.

> In addition to the adverse effects of *usury ceilings* on credit availability, mortgage rate *ceilings* must be removed if savings and loan institutions ... are to begin to pay market rates of interest on savings deposits. Without enhancing the ability of institutions to achieve market rates on both sides of their balance sheets, the sta-

bility and continued viability of our nation's financial system would not be assured.

*Id.* at 255 (emphasis added).

The district court correctly noted that Congress intended to preempt state laws imposing usury *ceilings, Grunbeck,* 848 F.Supp. at 299, but nonetheless concluded that "the [SIS] ... would limit the availability of mortgage funds *in a way comparable to* a numerical cap on interest rates." *Id.* (emphasis added). True, demand for home mortgage credit could be reduced were lenders to decline to defer interest payments, even though the SIS does not place a ceiling on simple interest rates. But though potential homebuyers might borrow less (or not at all) were lenders to decline to defer interest payments or demand too high a rate or amount of simple interest for doing so, the potential homebuyer's decision would be the result of market forces, *the phenomenon Congress set out to facilitate in its enactment of section 501(a)(1).* That is to say, the SIS ban against charging interest on interest would neither *"require* mortgage rates below market levels of interest," nor *cause "artificial* disruption in funds availability." *See* 1980 U.S.C.C.A.N. at 254 (emphasis added).

 Moreover, market adjustments in simple interest rates, which New Hampshire home mortgage lenders are free to adopt under the SIS, tend to promote equilibrium between credit supply and credit demand. In contrast, lenders may be *forced* from a credit marketplace governed by interest rate *ceilings* where the only alternative is to make loans at interest rates below the levels obtainable in competing loan markets. Credit supply *is artificially disrupted* in such a lending environment because credit *demand* tends to go unmet where borrowers are attracted by below-market interest rates *but lenders are not.* As a result, credit demand

---

cludes two separate and dramatically different preemption provisions. *Id.* Consequently, an interpretation of the progenitor of § 521, i.e., the National Bank Act, affords little, if any, insight into the § 501 preemption provision at issue in the present case. Second, *Donnell* is inapposite to the present inquiry not only because it construed an unrelated statute—§ 85 of the National Bank Act—but because the SIS does not *"expressly* limit[ ] the rate or amount of interest"

even assuming that a *ban* against compounding can be considered a *limitation* on the rate of interest "allowed by the laws of the State...." *Donnell,* 195 U.S. at 373, 25 S.Ct. at 49. Indeed, it is surpassingly awkward to ascribe meaning to the term "expressly" if the SIS *ban* against compounding is considered an *"express[ ] limit[ation* on] the *rate or amount* of interest" which may be charged, since *no* rate or amount of "interest on interest" may be charged under the SIS.

**340**

and credit supply are less likely to attain equilibrium at the usury-ceiling level. In these respects at least, a ban on compounding is in no sense comparable to a mortgage interest rate ceiling.[8] Thus, an outright ban against charging interest on interest does not work the adverse effects on the credit marketplace which concerned Congress in section 501(a)(1), viz., *artificial* disruptions in credit availability caused by State *ceilings* on interest rates resulting in *below-market* rates. Accordingly, we believe the relevant legislative history provides sturdy support for the view that the important modifier "expressly" may not be read out of section 501(a)(1) and the term "limiting" is not to be equated with "banning."

Congress also signaled its narrow preemptive intent under section 501(a)(1) by insulating these mortgage loans from state *usury limitations only,* and not from other state-law limitations encompassed within the "annual percentage rate" nor other state-law limitations designed to protect borrowers:

> In exempting mortgage loans from state usury limitations, the Committee intends to exempt only those limitations that are included in the annual percentage rate. The Committee does not intend to exempt limitations on prepayment charges, attorney fees, late charges *or similar limitations designed to protect borrowers.*

1980 U.S.C.C.A.N. at 255 (emphasis added). The district court concluded, without elaboration, that "interest on interest prohibitions ... are 'included' in the interest rate." *Grunbeck,* 848 F.Supp. at 300. Dime Savings so contends on appeal, maintaining that the SIS ban against charging interest on

interest is included in the "annual interest rate." We cannot agree.

In the first place, a ban against compounding interest affords significant consumer protections to homebuyers. Charging interest on deferred interest under a residential mortgage not only increases the "unseen" *costs* of home ownership but erodes home equity. Moreover, the relevant legislative history addresses "state usury *limitations*" only. The SIS, on the other hand, is no mere "limitation" but an outright ban against calculating interest on interest. The ordinary meaning of the term "limiting" is either—as the district court and Dime Savings view it—"serving to restrict or restrain" or—as the Grunbecks urge—to enforce a "final, utmost or furthest boundary." *Id.* at 298. But the SIS does not merely "limit," *nor* does it simply "restrain," compounding; it *prohibits* it. Thus, the "plain language" interpretation advocated by Dime Savings cannot be endorsed without disregarding the ordinary meanings of the distinctive terms "ban" or "prohibit" and "limit" or "restrain." *See Greenwood Trust,* 971 F.2d at 824.

### 3. *Administrative Regulations and Opinions*

 Congress authorized the FHLBB and its successor, the Office of Thrift Supervision ("OTS"), "to issue rules and regulations and to publish interpretations governing the implementation of [section 501]." 12 U.S.C. § 1735f–7a(f). Judicial review of an agency's interpretation of the statute it administers implicates two preliminary inquiries. *Strickland,* 48 F.3d at 16 (citing *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82). The first is whether Congress has "di-

---

8. As a "[p]revious interpretation of similar language in similar legislation," the district court cited to *"Fourchon, Inc. v. Louisiana Nat'l Leasing Corp.,* 723 F.2d 376, 381–83 (5th Cir.1984) (construing phrase 'rate of interest' in [§ 926(d) of the] Preferred Ship Mortgage Act in accordance with previous construction of similar phrase in National Bank Act to preempt state law prohibiting charging of interest on interest)." *Grunbeck,* 848 F.Supp. at 300. But the policies subserved by § 926(d) of the Preferred Ship Mortgage Act are much broader than those underlying § 501 of the Monetary Control Act. "The Preferred Ship Mortgage Act was designed to avoid parochial limitations on the ready avail-

ability of credit to the shipping industry by *wholly and completely superseding* state law and practice in every respect." *Fourchon,* 723 F.2d at 387 (Shaw, J., dissenting) (emphasis added). "[T]he policies behind the Preferred Ship Mortgage Act support an expansive interpretation of the term 'rate of interest' in section 926(d)." *Fourchon,* 723 F.2d at 382. As discussed above, however, *see* Section B.2, the policies underlying § 501 of the Monetary Control Act do not support a broad interpretation of the term "rate or amount of interest." Consequently, the *Fourchon* interpretation affords little insight into the preemptive intent underlying § 501 of the Monetary Control Act.

rectly spoken to the precise question at issue." *Id.* (quoting *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781) (internal quotation marks omitted). If not, we inquire "whether the agency's answer is based on a permissible construction of the statute." *Id.* (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782) (internal quotation marks omitted). Although we accord deference to the agency's interpretation, the final word on statutory interpretation is for the courts. *Chevron,* 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."). Furthermore, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* Where an agency interpretation is based exclusively on its reading of the bare statutory language, no special deference is due. *See Strickland,* 48 F.3d at 16. Furthermore, if "the statute itself, viewed in connection with the statutory design and the legislative history, reveals an unequivocal answer to the interpretive question, the court's inquiry ends." *Id.* at 17.

### a. *FHLBB Regulations*

The FHLBB has issued administrative regulations for the implementation of section 501, *see* 12 C.F.R. Part 590 (1988), which focus upon the effect of interest *ceilings* on the availability of mortgage credit. "The purpose of this permanent preemption of state interest-rate *ceilings* applicable to Federally-related residential mortgage loans is to ensure that the availability of such loans is not impeded in states having restrictive interest limitations...." 12 C.F.R. § 590.1(b) (emphasis added). The FHLBB has reaffirmed that "[n]othing in this section preempts limitations in state laws on prepayment charges, attorneys' fees, late charges or other provisions designed to protect borrowers." *Id.* § 590.3(c).

 A statute that imposes an outright ban against compounding does not place a "ceiling" on interest rates or amounts. *See supra* p. 339. Moreover, assuming it may affect loan demand, a ban against charging interest on interest does not *artificially disrupt* the availability of home mortgage credit. *See supra* at pps. 339–340. Finally, given the commercial realities, it is reasonably clear that the SIS ban against charging interest on interest not only affords important protections to homebuyers but does so without "expressly limiting" interest rates.

### b. *The FHLBB and OTS Opinions*

In response to an inquiry in 1984 as to whether "Michigan laws regarding the charging of interest on deferred interest" were preempted by section 501, the FHLBB opined that "state laws which would prohibit the charging of [interest on] interest would constitute provisions 'limiting the rate or amount of interest ... which may be charged....' It is our opinion that such charges are not consumer protection provisions of the type contemplated by 12 C.F.R. § 590.2(c) (1984) such as limitations on prepayment charges, attorney's fees and late charges." Op.Off.Gen.Counsel, FHLBB 1097 (November 15, 1984). In 1991, the OTS followed suit with an opinion reaffirming the 1984 FHLBB opinion that a state statute regulating "compounding" is preempted by section 501. Op.Off.Chief Counsel, OTS 91/CC–37 (Aug. 16, 1991).

We agree with the district court that these opinions are not controlling. *See Grunbeck,* 848 F.Supp. at 298 ("Although these two opinions unequivocally support [Dime Savings'] reading of § 501(a)(1), the regulators have failed to provide any analytical support for [their conclusion]. In this circumstance, absolute deference would be nothing more than blind allegiance."). The district court's observations are plainly correct. Neither regulatory body tendered a *rationale* for its opinion. The FHLBB—the first to address the question—neither described, nor cited, the Michigan provision to which its opinion related.[9] And neither agency parsed the section 501(a)(1) preemption clause language.

---

**9.** The OTS indicated that the party requesting its opinion had represented that Michigan has no

■ As deference ultimately "depends on the persuasiveness of the agency's position," *Strickland,* 48 F.3d at 18, we agree that none is due in this instance. The interpretation adopted by these agencies disregarded entirely the term "expressly"—which plainly constrains the scope of the section 501(a)(1) preemption clause—and overlooked the relevant legislative history explicitly declaring a congressional intention to preempt state usury-law *ceilings*—as distinguished from bans on compounding—which result in artificial disruptions in home-mortgage loan credit by mandating *below-market* interest rates. Finally, even assuming the FHLBB interpretation were apposite to the present discussion, in the respect that the Michigan provision with which it dealt imposed a ban on compounding, there is no explicit indication that either agency considered the significant consumer protections, *see supra* at 340, afforded by state bans—such as the SIS—against charging interest on interest. For these and other reasons discussed at length in this opinion, we conclude that the agency interpretation relied on by Dime Savings is unpersuasive and entitled to no deference in the present context.

### c. *The Parity Act*

The district court rejected the State's argument that passage of the Alternative Mortgage Transaction Parity Act of 1982 ("Parity Act"), 12 U.S.C. §§ 3801 *et seq.,* two years after passage of the Monetary Control Act, supports a narrow construction of the preemptive scope of section 501(a)(1). *Grunbeck,* 848 F.Supp. at 301–02. We nonetheless believe that significant insight can be gleaned from the Parity Act.

■ The Parity Act preempts State bans on certain "alternative mortgage trans-

actions," [10] by which is meant "all manner of mortgage instruments that do not conform to the traditional fully-amortized, fixed-interest-rate mortgage loan." *First Gibraltar Bank, FSB v. Morales,* 19 F.3d 1032, 1037 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 204, 130 L.Ed.2d 134, *vacated on other grounds,* 42 F.3d 895 (5th Cir.1995) (per curiam). Common forms of "alternative mortgage transactions" include adjustable interest rate mortgages, which may permit negative amortization, and graduated payment mortgages, which may temporarily lower the mortgage payment to less than the monthly interest due, resulting in planned negative amortization whereby interest is charged on the deferred interest. *Id.* (citing generally to Grant S. Nelson & Dale A. Whitman, *Real Estate Transfer, Finance, and Development* 1000–13 (4th ed. 1992)). Other planned negative amortization provisions include the reverse annuity mortgage ("RAM") and the credit conversion mortgage, both of which charge interest on deferred interest. *Id.* "An alternative mortgage transaction may be made by a housing creditor in accordance with [section 3803], notwithstanding any State constitution, law or regulation." 12 U.S.C. § 3803(c). It is a requirement of section 3803 that for "housing creditors [other than banks and credit unions] ... transactions [must be] made in accordance with regulations governing alternative mortgage transactions as issued by the [OTS]...." *Id.* § 3803(a)(3). These OTS regulations, *see* 12 C.F.R. § 545.33(f)(4)–(11) (1988), impose, *inter alia,* substantial lender disclosure requirements relating to features unique to alternative mortgage transactions.

The State argued below that it would be " 'illogical and contrary to public policy' " for

---

statute on the subject and that the Michigan provision relating to "interest on interest" originated in uncited caselaw announced around the turn of the century.

10. The term "alternative mortgage transaction" means a residential mortgage loan—
(A) in which the interest rate or finance charge may be adjusted or renegotiated;
(B) involving a fixed-rate, but which implicitly permits rate adjustments by having the debt mature at the end of an interval shorter

than the term of the amortization schedule; or
(C) involving any similar type of rate, method of determining return, term, repayment, or other variation not common to traditional fixed-rate, fixed-term transactions, including without limitation, transactions that involve the sharing of equity or appreciation;
described and defined by applicable regulation.
12 U.S.C. § 3802(1).

Congress to require—as a precondition to preemption under the Parity Act—that negative amortization loans conform with OTS disclosure regulations "if lenders could claim preemption for the same transactions under [the Monetary Control Act] without making the required disclosures." *Grunbeck*, 848 F.Supp. at 302. Although, as the district court correctly observed, "[c]onstruing the Monetary Control Act to preempt simple interest laws does not *eliminate* the incentive for lenders to comply with the Parity Act's disclosure requirements," *id.* (emphasis added),[11] it must also be noted that negative amortization provisions whereby interest is assessed on deferred interest are common features in *various forms* of alternative mortgage transactions; e.g., graduated payment mortgages, RAMs, and credit conversion mortgages. Because a ban against charging interest on interest would preclude a central feature common to many forms of alternative mortgage transactions, simple interest statutes unquestionably infringe upon alternative mortgage loans, even though they do not impose an outright ban. Thus, as the State contends, construing the Monetary Control Act so as to preempt simple interest laws, such as the SIS, would significantly *reduce* these alternative mortgage lenders' incentive to comply with the Parity Act disclosure requirements. Whether or not illogical, there can be little question that this result would conflict with the policy underlying the Parity Act and, thus, with the intent of Congress.

■■■■ As the district court noted, "the Parity Act and the Monetary Control Act serve related but distinctly different functions." *Id.* The Parity Act represents a congressional response to a concern, amongst others, that State bans on mortgages other than traditional fixed-rate mortgages would reduce the overall availability of mortgage credit, since fixed-rate mortgages had become relatively more expensive as the result of increased interest-rate volatility.

The Congress hereby finds that—

(1) increasingly volatile and dynamic changes in interest rates have seriously impaired the ability of housing creditors to provide consumers with fixed-term, fixed-rate credit secured by interests in real property, cooperative housing, manufactured homes, and other dwellings;

(2) alternative mortgage transactions are essential to the provision of an adequate supply of credit secured by residential property necessary to meet the demand expected in the 1980's;....

12 U.S.C. § 3801(a). These concerns prompted Congress to authorize *State*-chartered housing lenders, such as Dime Real Estate NH, to enter into alternative mortgage transactions.

It is the purpose of [the Parity Act] to ... provide [*nonfederally* chartered housing creditors] ... parity with federally chartered institutions by authorizing all housing creditors to make, purchase, and enforce alternative mortgage transactions so long as the transactions are in conformity with the regulations issued by the Federal agencies.

*Id.* at § 3801(b). *See also First Gibraltar Bank, FSB*, 19 F.3d at 1043. Thus, the purpose of the Parity Act was to preempt State *bans* on alternative mortgage transactions, including adjustable rate mortgages permitting negative amortization whereby interest may be charged on deferred interest payments.[12]

In the Monetary Control Act, on the other hand, Congress was responding to the very different concern that State interest-rate *ceilings* were depressing home-mortgage interest rates to *below-market* levels, thereby artificially disrupting the availability of funds for both traditional fixed-rate mortgages and

---

11. The court explained that "negative amortization provisions are not the only characteristics that qualify a loan as an alternative mortgage transaction," and, further, that "[s]imple interest laws are merely one of several categories of" state laws "inconsistent with a qualifying lender's right to issue alternative mortgage loans." *Id.*

12. The parties do not dispute that the Dime Savings loan is an "alternative mortgage transaction," though they disagree whether the loan was made in accordance with OTS regulations. We do not resolve the Dime Savings' Parity Act preemption claim as applied to the present loan, however, since it has not yet been considered by the district court.

"alternative mortgage transactions." The latter concern prompted Congress to preempt only state laws "expressly limiting the rate or amount of interest." Thus, section 501(a)(1) of the Monetary Control Act was not aimed at preempting State laws, such as the SIS, which prohibit "alternative mortgage transactions" permitting negative amortization whereby interest may be charged on deferred interest.

## III

### *CONCLUSION*

We hold that the New Hampshire Simple Interest Statute, as applied to the Dime Savings loan, is not preempted by section 501(a)(1) of the Monetary Control Act. Consequently, we remand to permit the district court to consider the remaining issues relating to the petition to enjoin foreclosure on the Grunbeck residence.

*The judgment is vacated and the case is remanded for further proceedings consistent with this opinion. Costs are awarded to appellants.*