Dear Commissioner Hergenroeder:
You have requested our opinion whether federal law has preempted the provisions of Maryland law that prohibit or limit charging and collecting prepayment fees from Maryland consumer borrowers. Specifically, you ask about the preemptive effect of the federal Alternative Mortgage Transaction Parity Act of 1982 (the "Parity Act" or "Act"). You have limited the scope of your question to lenders who are required to be licensed under the Maryland Mortgage Lender Law ("MMLL"), Title 11, Subtitle 5 of the Financial Institutions ("FI") Article, Maryland Code.
In our opinion, State law provisions that prohibit or limit these prepayment fees are preempted and may not be enforced when a licensed mortgage lender (i) engages in an "alternative mortgage transaction," as defined by federal law; (ii) meets the federal definition of a "housing creditor"; and (iii) extends credit in compliance with applicable federal regulations.
 I Nature and Purpose of the Parity Act
Through the Parity Act, Congress intended to create an environment in which all housing creditors, including state-licensed or chartered institutions, may make, purchase, and enforce "alternative mortgage transactions" in conformity with applicable federal regulations. The term "alternative mortgage transaction" is defined in 12 U.S.C. § 3802(1) as "a loan or credit sale secured by an interest in residential real property, a dwelling, all stock allocated to a dwelling unit in a residential cooperative housing corporation, or a residential manufactured home . . ."
 (A) in which the interest rate or finance charge may be adjusted or renegotiated;
 (B) involving a fixed-rate, but which implicitly permits rate adjustments by having the debt mature at the end of an interval shorter than the term of the amortization schedule; or
 (C) involving any similar type of rate, method of determining return, term, repayment, or other variation not common to traditional fixed-rate, fixed-term transactions, including without limitation, transactions that involve the sharing of equity or appreciation; described and defined by applicable regulation. . . .
Thus, the Parity Act applies to "all manner of mortgage instruments that do not conform to the traditional fully-amortized, fixed-interest-rate mortgage loan." FirstGibratar Bank v. Morales, 19 F.3d 1032, 1037 (5th Cir. 1994),cert. denied, 115 S.Ct. 204 (1995), vacated on other grounds,42 F.3d 895 (5th Cir. 1995).
Prior to the effective date of the Act, nonfederally chartered lenders were at a competitive disadvantage vis-a-vis
federally chartered entities, which arguably were not subject to the limitations of state laws. Thus, the Act seeks to end the competitive disadvantage of these "housing creditors."[1] To qualify as a "housing creditor," a person must comply with any applicable state licensing law.12 U.S.C. § 3802(2).
Housing creditors must also comply with applicable federal regulations. The applicability of particular federal regulations depends on the type of creditor making the loan: federally and state-chartered banks must comply with applicable regulations of the Office of the Comptroller of the Currency ("OCC"); credit unions must comply with those of the National Credit Union Administration ("NCUA"); and all other housing creditors lending under the Act must comply with the regulations of the Office of Thrift Supervision ("OTS") that govern alternative mortgage transactions.
 II Parity Act Preemption Provision
A. In General
The preemption clause of the Act provides that "[an] alternative mortgage transaction may be made by a housing creditor in accordance with [the Act], notwithstanding any State constitution, law, or regulation." 12 U.S.C. § 3803(c). While the preemptive intent of Congress is clear, the statutory language provides little guidance as to the extent of the preemption. However, the purposes of the Act are illuminating: "to prevent discrimination against State-chartered depository institutions, and other nonfederally chartered housing creditors, with respect to making, purchasing and enforcing alternative mortgage transactions. . . ." 12 U.S.C. § 3803(a). In short, the purpose of the Act was to increase the overall availability of mortgages by eliminating state barriers to creditors' increasing reliance on alternative mortgage transactions. Grunbeck v. Dime Savings Bankof New York, 74 F.3d 331, 343 (1st Cir. 1996).[2]
To help achieve this objective, Congress directed the OCC, NCUA, and OTS to identify those portions of their regulations "that are inappropriate for (and thus inapplicable to), or that need to be conformed for the use of," the nonfederal housing creditors making loans under the Act. Section 807(b) of Pub.L. 97-320, 12 U.S.C. § 3801 note. Congress evidently intended to preempt those state laws that limit the ability to engage in alternative mortgage transactions by nonfederal housing lenders,vis-a-vis their federal counterparts. Thus, when federal regulations designated as applicable to these loans create a competitive advantage for federally-chartered housing lenders, the corresponding disadvantageous state laws are preempted, to the extent identified by the applicable federal agency.
B. Prepayment Fees
One area of preemption involves prepayment fees, because the ability of a housing creditor to impose prepayment fees is thought to enlarge the secondary market for these loans, thereby increasing the amount of housing credit available. The OCC has explicitly preempted state laws that block commercial banks from imposing prepayment fees in connection with adjustable rate mortgages (ARMs):
 A national [or state] bank offering or purchasing ARM loans may impose fees for prepayments notwithstanding any State law limitations to the contrary. For purposes of this section, prepayments do not include: (a) Payments that exceed the required payment amount to avoid or reduce negative amortization; or (b) Principal payments, in excess of those necessary to retire the outstanding debt over the remaining loan term at the then-current interest rate, . . . in accordance with rules . . . contained in the loan documents.
12 C.F.R. § 34.23. See also 12 C.F.R. § 34.24 (applying provision to state-charted commercial banks). This provision applies only
to ARMs, however, which are defined in 12 C.F.R. § 34.20 as "an extension of credit made to finance or refinance the purchase of, and secured by a lien on, a one-to-four family dwelling . . ., where the lender . . . may adjust the rate of interest from time to time." Thus, the preemptive effect of § 34.23 extends only to this specific type of alternative mortgage transaction.
Likewise, the OTS has authorized housing creditors other than commercial banks or credit unions to impose prepayment fees:
 Any prepayment on a real estate loan must be applied directly to reduce the principal balance on the loan unless the loan contract or the borrower specifies otherwise. Subject to the terms of the loan contract, a [housing creditor] may impose a fee for any prepayment of a loan.
12 C.F.R. § 560.34. See also 12 C.F.R. § 560.220 (preempting state laws that would prevent the application of the authority granted in 12 C.F.R. § 560.34).
Applicable NCUA regulations do not allow prepayment penalties to be charged by federal credit unions. 12 C.F.R. § 701.21(a) and (c)(6). Thus, State-chartered credit unions electing to lend under the Act would encounter a general prohibition on charging prepayment fees. As a practical matter, then, State-chartered credit unions may well not elect to extend credit using the Parity Act.
 III Preemption of Maryland Law
A. Restriction on Prepayment Fees
As a general matter, credit secured by real property can be extended under one of several subtitles of Title 12 of the Commercial Law ("CL") Article. Depending upon the characteristics of a particular loan and, in some cases, the creditor's election, these loans may be made pursuant to CL Title 12, Subtitles 1, 3, 4, 9, or 10. The particular subtitle that applies to a transaction contains its own limitations on fees and charges, including prepayment penalties.
Thus, CL, § 12-308(c)(1) and 12-407(d)(1) prohibit prepayment fees. CL, § 12-1009(e) likewise prohibits prepayment fees in connection with loans to consumers. CL Title 12, Subtitle 9 is silent about prepayment penalties. CL, § 12-905(b), however, permits only certain specifically enumerated fees and charges with respect to secured, open-end credit to consumers. The absence of prepayment fees from the list means that these charges are not permitted under CL Title 12, Subtitle 9.
In contrast, CL Title 12, Subtitle 1 does permit prepayment fees, within very narrowly established guidelines. In connection with a residential first-mortgage transaction, there is no interest rate ceiling if, among other things, the lender does not have a contractual right to a prepayment penalty in connection with the loan. CL, § 12-103(b). If the contract includes a prepayment penalty, the 8% interest rate ceiling of CL, § 12-103(a) applies. See also CL, § 12-105(b)(4) (identifying circumstances under which a prepayment penalty is not considered interest). CL, § 12-126(b) further provides: "Except to the extent expressly provided otherwise in the loan contract, a borrower may prepay all or part of outstanding unpaid indebtedness under a loan at any time." This section reinforces the conclusion that, within the limits of CL Title 12, Subtitle 1, the contract governs the imposition of prepayment penalties.
Thus, it is clear that State law prohibitions against and restrictions on prepayment fees do place nonfederally-chartered housing creditors in Maryland at a competitive disadvantage with their federally-chartered counterparts, which are not subject to these prohibitions and restrictions. This "uneven playing field" presents the very situation that the Parity Act was intended to prevent.
B. Failure to Override Preemption
The Parity Act authorized states to override the partial federal preemption of state laws applicable to alternative mortgage transactions within three years from the effective date of the Act, October 15, 1982. 12 U.S.C. § 3804. To do so, a state must have adopted, between October 15, 1982, and October 15, 1985, a provision "which states explicitly and by its terms that such State does not want the preemption . . . to apply with respect to alternative mortgage transactions."
Between October 15, 1982, and October 15, 1985, CL, § 12-103, 12-308, and 12-905 were amended, and CL Title 12, Subtitles 9 and 10 were first enacted.[3] None of these measures, however, made mention of the Act or expressed an intent to override federal law. In view of the specificity required for a state law to override the Act's preemption, these provisions did not do so.[4] Therefore, the restrictions imposed by CL Title 12, Subtitles 1, 3, 4, 9, and 10 on prepayment fees are subject to the Act's preemption mechanism.
 V Conclusion
In summary, it is our opinion that CL, § 12-103(b)(1)(iii), 12-105(b)(4), 12-308(c), 12-407(d), 12-1009(e) and those portions of Title 12, Subtitle 9 that limit the charging of prepayment fees are preempted by the Parity Act and do not apply to alternative mortgage transactions if the lender is a "housing creditor" and the extension of credit is made in compliance with the Act and applicable federal regulations.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Thomas L. Gounaris Assistant Attorney General
____________________ Jack Schwartz Chief Counsel Opinions Advice
[1] "Housing creditor" means:
(A) a depository institution . . .;
 (B) a lender approved by the Secretary of Housing and Urban Development for participation in any mortgage insurance program under the National Housing Act . . .;
 (C) any person who regularly makes loans, credit sales, or advances secured by interests in properties referred to in [the definition of "alternative mortgage transaction"]; or
(D) any transferee of any of them. . . .
12 U.S.C. § 3802(2).
[2] "[F]ixed-rate mortgages," the First Circuit pointed out, "had become relatively more expensive as the result of increased interest-rate volatility." Id.
[3] CL, § 12-126 was enacted after the preemption period had expired. Chapter 409 of the Laws of Maryland 1991.
[4] We express no opinion whether, under some circumstances, an explicit statement in a bill's authoritative legislative history might satisfy the Parity Act's requirement for a state decision to override preemption. No statement about Parity Act preemption appears in the legislative history of the laws mentioned in text.
 *Page 84